THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLARD L. SPAULDING *et al.*, Defendants-Appellants.

First District (5th Division)   No. 76-1221

Opinion filed January 26, 1979.

Irwin L. Frazin and Jody C. Weiner, both of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Kenneth T. McCurry, and Carol A. Kearney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, Cletus Eller and Willard Spaulding were each found guilty of aggravated battery. (Ill. Rev. Stat. 1975, ch. 38, par. 12—4.) Spaulding was also found guilty of murder. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1.) Eller was sentenced to serve one year to one year and a day while Spaulding was sentenced to serve one year to two years for aggravated battery and 14 to 18 years for murder. On appeal, they

contend that they were not proven guilty beyond a reasonable doubt and that they were denied a fair trial where the trial court: (1) admitted evidence regarding a gun which was not suitable for commission of the offense charged; (2) allowed impeachment of a defense witness by means of inadmissible and highly prejudicial evidence; (3) admitted hearsay testimony; (4) allowed improper and argumentative cross-examination of defense witnesses; and (5) failed to instruct the jury on the defense theory of the case.

The following evidence is pertinent to a disposition of this appeal.

*For the State*
*James Warsa*
On December 13, 1974, he and Pete Najera parked Najera's car at 83rd and Commercial and rode the train to downtown Chicago where they shopped and had dinner. After they had "three or four beers" they returned by train to 83rd and Commercial and went to Woody's Tavern, arriving at about 9:15 p.m. They sat at the bar and were each served a beer. Warsa left his seat to make a phone call from a public telephone. As he was making the call Pete approached him and spoke to him, so he immediately hung up the phone and returned to his seat at the bar. A minute later two men whom he had never seen before approached them. He identified these men as defendants Spaulding and Rick Schmidt. Spaulding, holding what "looked like a .38 revolver" under Pete's chin, said "you ain't so f_____ tough." Schmidt placed a knife against his neck and "told me to sit down, stay." The bartender approached Spaulding and said, "I don't want no shit in here." Pete told Spaulding, "You got the pistol, you're the best." Schmidt said "Let's take these Mexican bastards out of here and kill them." Schmidt held a knife to his back, while Spaulding had a gun to Pete's back. Schmidt and Spaulding then took them outside where Schmidt took some money from each of them, and Spaulding hit Pete on the forehead with the pistol. Spaulding and Schmidt then told them to "Get the hell out of here."

Pete started walking to the car. Warsa did not go with Pete. Instead, he crossed 83rd Street and was walking south on Commercial when he heard footsteps, turned around and saw Schmidt, "coming at me." Schmidt started swinging at him, and they fell to the ground wrestling. When he regained his feet he observed Spaulding about four or five feet away pointing the same gun which he had seen earlier. Spaulding told Schmidt, "Let me get a shot at him." He attempted to protect himself by holding Schmidt "in the line of fire" and heard someone who sounded like Pete say "Leave him alone." Pete had just come from a nearby alley and had a shotgun in his hand. He did not see from where Pete got the gun. He

then heard a loud noise that sounded "like a shotgun" and saw Spaulding and Pete struggling over the shotgun. When Pete told him to leave, Warsa walked north and as he looked back he observed a police car arriving.

Warsa then walked about two blocks to the home of Frank Tavitas. He and Tavitas then drove in Tavitas' car to the home of Benito Najera. He, Benito and Tavitas went to the police station where they found Pete in jail and gave him some money. They then drove to Woody's Tavern, arriving at 12:45 a.m., and asked the bartender if he would tell the truth as to what happened earlier. Spaulding, Schmidt and another man whom he identified as defendant Cletus Eller then entered the tavern. Schmidt approached him, "mumbled" something and hit him in the jaw. He and Schmidt "started to wrestle, fell on the ground" and went "into headlocks." Tavitas pulled Schmidt off of him. Benito Najera was standing about six feet away, near the bar. Spaulding "had a gun on Benito." He heard Eller say, "Kill him, kill him, kill him, kill them Mexican bastards." As Tavitas started to move toward Benito, Spaulding fired one shot which struck Benito. When Benito fell to the floor, Spaulding began kicking him as Schmidt and Eller yelled, "Kill 'em, Kill 'em." Tavitas tried to assist Benito but was pulled back by Eller. Spaulding beat Tavitas on the head with his pistol while Schmidt again began to fight with Warsa, kicking him in the ribs, legs and head. Spaulding also struck him "quite a few times" with the pistol. The last thing he remembered was someone saying the police were coming.

When he regained consciousness he was either in a police car or the hospital. At the hospital he was shown "quite a few" photographs by the police and selected the photographs of Spaulding and Schmidt. He identified People's Exhibit 2 as being similar to the gun with which Spaulding shot Benito.

On cross-examination Warsa admitted that on January 23, 1972, he was sentenced to two to four years in prison for armed robbery. He did not recall an individual named Tom Pantaliono being involved in the shotgun incident outside of Woody's Tavern. When he went to visit Pete at the jail, he did not tell the police that he had been attacked or robbed at knife point, but he did register a complaint the next day. Although he was originally upset that Spaulding and Schmidt were not arrested following the first incident, he had "cooled off" by the time he saw them in Woody's the second time.

*Peter James Najera (Pete)*

He was the nephew of Benito Najera. He corroborated Warsa's testimony concerning the shopping trip and the first visit to Woody's Tavern. Warsa got up to make a phone call while he ordered two beers. Schmidt approached him and said, "What are you doing here?" He tried to ignore Schmidt because "hassles I don't want." When he tried to get up

to tell Warsa they ought to leave, Schmidt told him, "you ain't so mother-f_____ tough." Warsa returned to his seat and they decided to finish their beers. Spaulding then put a gun under his chin and asked him if he thought he was "tough." He replied that "as long as he had his gun there he was the best man. He was the greatest." Schmidt also had what appeared to be a pistol under Warsa's chin. When the bartender said he did not want any trouble, Spaulding told him there was not going to be "any shit in the place" and to get back to the bar.

Spaulding then said, "Let's take them outside and kill these Mexican bastards." Spaulding hit him on the head with the pistol and "prodded" him out the door with the gun. Schmidt also forced Warsa outside. Spaulding then took $8 or $9 from him and said that "if he seen us Mexicans around here anymore he was going to kill us."

Spaulding again hit him with the pistol. He then left and went to his car. Realizing Warsa was not with him, he circled around in his car and found Warsa and Schmidt struggling. Spaulding who was also present, held a pistol. Schmidt yelled something like "shoot him." He took a shotgun, which he had used while hunting earlier in the day, from the trunk of his car and fired a shot in the air "to scare them off Mr. Warsa." He and Spaulding were struggling over the shotgun when the police arrived. Spaulding then ran upstairs "to see if the blast had woke up the kids," and a Mr. Pantaliono who he had not seen earlier came downstairs. Although he told the police that he had been robbed, he was placed under arrest and taken to the police station. At the station Spaulding told him that "if he would have had the shotgun I would have been dead."

On cross-examination he admitted that in 1964 he was convicted of robbery. He also admitted that he pled guilty to a charge of assault upon Thomas Pantaliono even though he was not in fact guilty. He feared a longer sentence if he did not plead guilty and believed he was pleading guilty only to discharging a firearm within the city limits. He denied telling anyone that he was sorry he missed Spaulding when he fired the shotgun, adding that, "if I had wanted to hit him with the shotgun, I would have hit him."

*Frank Tavitas*

Benito Najera was his stepfather, and Pete Najera is his cousin. After 10 p.m. on December 13, 1974, James Warsa arrived at his home. After conversing with Warsa, he called the police station, received certain information, and then drove with Warsa to Benito Najera's home. He, Warsa and Benito proceeded to the police station where they gave Pete Najera bond money and food. He then left with Benito and Warsa to pick up Pete's car. Before getting the car they entered Woody's Tavern to talk to the bartender about "a prior incident that happened there." They sat at the bar and ordered beers.

As they were talking to the bartender, three guys who he identified in court as Eller, Spaulding and Schmidt walked into the tavern. Schmidt struck Warsa on the head. Then Eller struck Tavitas knocking him to the floor. He began fighting with Eller while Warsa and Schmidt "were rolling around wrestling on the ground next to us." Benito remained at the bar. Warsa put his hands in Eller's mouth "to stretch it out." When Eller said he had had enough, "I let him go." and forced Schmidt off of Warsa. He observed Spaulding pointing "a revolver, short barrel" at Benito. Benito had his hands up and was telling Spaulding, "You don't need a gun. Put the gun away." Eller then screamed, "Kill them Mexican bastards, all of them," several times. Tavitas took two or three steps toward Spaulding who turned and pointed the gun at him. Benito then went toward Spaulding and Spaulding "pushed him back and fired at him." Benito fell to the floor. He tried to pick Benito up, but Eller pulled him away and Spaulding "began to pistol whip me" on the head. Spaulding hit him on the head a dozen or more times and Eller said, "Kill him." Spaulding and Eller began pistol whipping and kicking Warsa and kicking Benito. When someone said the police were coming, defendants ran away.

As a result of the beating he received a cerebral concussion and lacerations on the head and hands. While in the hospital he identified photographs of Spaulding and Schmidt.

At trial he identified People's Exhibit 2 as being a weapon "very similar" to that which Spaulding used to beat him.

*John Roberts, Chicago Police Officer*

He was approaching the intersection of 83rd and Commercial at approximately 1 a.m. on December 14, 1974, when he observed "a male white run from a bar known as Woody's Tap" to the rear of a building across the street. He immediately obtained the assistance of Officers Springer and Delapaz who were nearby. As they approached the tavern he observed two more male whites, one of whom he recognized as Spaulding, run from the tavern to the rear of the same building. When the officers called for Spaulding to come out of the building, he stuck his head out a second floor window, mentioned he had been sleeping, and asked what the officers wanted. Schmidt also appeared at the window. He told Spaulding "to stop fooling around * * * or we were going to come up and get him." When Spaulding and Schmidt exited the building he placed them under arrest. He then went upstairs to search for the third man. Although he did not find anyone in the apartment, he did recover a fully loaded .38-caliber revolver and three boxes of .38-caliber ammunition. On cross-examination he stated that Warsa did not make a statement to him.

*Joseph Delapaz, Chicago Police Officer*

He substantially corroborated Roberts' testimony concerning their arrival on the scene outside of Woody's. He added that while he was

"covering" the building across from Woody's Tavern, he heard someone yell, "Somebody been shot [sic]." He ran into the tavern where he observed Benito Najera, Tavitas and Warsa on the floor. Benito's "face was full of blood" and "a little swollen," he did not respond to questions and gave no sign of a pulse. Tavitas' face was covered with blood, he had lacerations on his head, and his hands were "limp swollen." Warsa was incoherent and semi-conscious.

### Bruce Perisho, Hammond (Indiana) Police Officer

He and his partner were parked in a police vehicle outside the Hammond Police Station at approximately 3:10 a.m. on December 14, 1974, when they were approached by defendant Eller. After Eller made a statement to them, he took Eller into the police station and called the Chicago Police Department. About an hour later two Chicago police officers arrived. Eller then led him and the Chicago police officers to a manhole cover and said, "This is where I dropped the gun." A two-inch Colt revolver containing one spent cartridge was recovered from the manhole. He identified People's Exhibit 2 as this revolver.

### Dr. Choi, Pathologist, Cook County Coroner's Office

The parties stipulated that if called to testify he would state that he examined the body of Benito Najera on December 14, 1974. Benito's death was caused by "a bullet wound of the chest."

### Ernest Werner, Chicago Police Department Firearms Expert

The parties stipulated that if called to testify he would state that on December 16, 1974, he examined the bullet removed from the body of Benito Najera and determined that this bullet was fired from the gun identified as People's Exhibit 2.

## For the Defendants

### John Rosewski

On the night of December 13, 1974, he was tending bar at Woody's Tavern. He was acquainted with defendants Spaulding, Eller and Schmidt. Schmidt entered the tavern between 9 and 9:30 p.m. accompanied by another man he knew only as Tom. When Warsa, Pete and Schmidt began arguing he told them "I don't want any fight in here." He did not observe a gun or knife at this time. He did not see Spaulding in the tavern during this argument. At about 1 a.m. the next morning Schmidt returned to the bar with Eller and Spaulding. Warsa was sitting at the bar with "two other Mexicans." A fight broke out and lasted four or five minutes. He did not know how the fight started. Although he did not see a gun he did hear a shot. He did not hear anyone yell, "Kill those Mexican bastards." He denied that before the fight started Warsa asked him whether he had been a witness to the earlier incident in the tavern.

On cross-examination he admitted that he knew each of the defendants on a first-name basis.

*Paul Nealas, Chicago Police Inspector*
During his investigation of the death of Benito Najera he interviewed Warsa and Tavitas, neither of whom told him about the earlier robbery or fights. However, when he observed Tavitas in the hospital his hands appeared to be lacerated and swollen and "he had cuts on the top of his head."

*Melvin Mazanarits, Chicago Police Officer*
He assisted in the arrest of Pete Najera on December 13, 1974. Pete did not complain that he had been robbed. On several occasions following the arrest, he heard Pete say something to the effect that next time he would not miss. He also heard Spaulding tell Pete that, "We will get you, too." The next day Pete complained to him that the police officers neglected their duty by not searching Spaulding and Schmidt.

*Thomas Pantaliono*
He is a carpenter employed by Spaulding. At approximately 6:30 p.m. on December 13, 1974, he and Schmidt went to Woody's Tavern to obtain their paychecks from Spaulding who was in the tavern with Eller. Spaulding and Eller both left Woody's at approximately 7 p.m. or 7:15 p.m. while he remained with Schmidt. As they were about to leave about 1½ or 2 hours later, Pete Najera and Warsa entered the tavern. Pete "bumped into" Schmidt knocking him against the bar. He then began fighting with Pete, but the bartender "broke it up." He denied having a gun in the tavern or holding a weapon to Pete's neck. He did not see Schmidt holding a weapon to Warsa's neck. Warsa and Pete left while he and Schmidt waited about five minutes, finished their beers and then left. As Pantaliono and Schmidt crossed the street, Warsa and Pete pulled up in a car. Warsa jumped out of the car and hit Schmidt. He watched as Schmidt and Warsa fell to the ground fighting. Pete appeared with a shotgun and said, "you guys have had it now." He grabbed the barrel of the gun, and Pete fired into the street. Warsa then ran away while he continued to struggle with Pete over the shotgun. Spaulding came downstairs from his apartment to give assistance. When the police arrived a minute later, Pete let go of the shotgun and Spaulding ran back upstairs with it. The police took Pantaliono to the station where he filed a complaint against Pete for aggravated assault. Pete later pled guilty to that charge.

On cross-examination he denied telling Pete Najera that, "I don't want you to go to jail" but that defendants "are bad news" and "would as soon kill you or me and then run back into the hills." He also denied telling Pete that defendants made sure he appeared in court.

*Patrick Ryan, Chicago Police Officer*
He participated in the arrest of Pete Najera on December 13, 1974. When he arrived at the scene he observed three men struggling over a

shotgun. He announced his office but the men continued fighting, moving "into the gangway of the house." Pete and Pantaliono came out of the gangway a minute later and were arrested. Spaulding next "stuck his head out the second floor window" asked what was going on, and then came downstairs with a shotgun.

*Lillian Coale*

At about 8 p.m. on December 13, 1974, she arrived at Woody's Tavern where she observed Schmidt and Pantaliono sitting at the bar. Warsa approached them and began arguing and "pushing and shoving" Schmidt. She denied seeing Spaulding in the tavern that night.

*Richard Schmidt, on his own behalf*

He was employed by Spaulding on December 13, 1974, and worked with Tom Pantaliono. At about 6:30 p.m., after finishing work, they went to Woody's Tavern where they found Spaulding and Eller. Spaulding gave them their paychecks, had a drink and left. Eller left 30 minutes later. As he and Pantaliono were talking, Pete Najera and Warsa walked up and Pete shoved him against the bar. Pantaliono then began wrestling with Pete. When the bartender told them to fight outside, they quit. He denied holding a knife to Warsa's neck or seeing Pantaliono with a gun. Warsa and Pete left a minute later. He and Pantaliono stayed five minutes longer and then left the tavern together. As they crossed the street, a car pulled up. Warsa got out of the car and, without saying a word, "swung at me." As he and Warsa wrestled on the ground, he heard a loud shot. He got up and saw Pantaliono wrestling with Pete who held a shotgun. Pantaliono told him to get help so he "ran upstairs and hollered for Willard [Spaulding]." Spaulding came down and tried to help take the gun away. He then chased someone he thought was Warsa for a block and a half down the street but the man escaped. When Schmidt returned the police and everyone else had left the scene. He phoned Eller to explain the situation and then drove to the police station where he found Spaulding and Pantaliono. Eller arrived later.

At about 1 a.m. he, Eller and Spaulding returned to Woody's to look for his glasses and have a drink. As they entered the bar Eller hollered, "That's Warsa there." Warsa called him a "Mother F'er" and "took a step toward me." Tavitas, who was with Warsa, then grabbed him from behind. He, Warsa and Tavitas then "started rolling around" fighting in the tavern breezeway. A minute later he heard a shot and stopped fighting to see what happened. He did not see anything so he began fighting again with Warsa. Warsa broke loose and ran into the tavern. Eller ran out of the tavern with a gun in his hand. He looked inside the tavern and saw Benito Najera lying on the floor bleeding. He did not see a pistol in Spaulding's hand. He and Spaulding left the tavern and were arrested later in Spaulding's apartment.

*Willard Spaulding, on his own behalf*

He is a remodeling contractor with an office and upstairs apartment across the street from Woody's Tavern. Eller, who was his brother, Schmidt and Pantaliono all worked for him in December 1974. At about 4:30 p.m. on December 13, 1974, he went to Woody's to wait for his employees. He saw Eller, Schmidt and Pantaliono, paid them, and went home at about 7 p.m. He went to bed at about 9 p.m. because he had an important job the next day and wanted to start early.

Sometime after Spaulding went to bed Schmidt came running upstairs shouting that "somebody was shooting at him." He ran downstairs and wrestled the shotgun away from Pete Najera. He then took the gun upstairs and set it behind a door. He "heard some people hollering for me to come out" so he went back downstairs. The police told him to get the gun. He complied with the order and was then taken to the police station.

He left the station after 15 or 20 minutes and returned to Woody's with Schmidt and Eller. He was not carrying a gun. As they entered the tavern someone started fighting with Schmidt while "some guy jumps on his back." Eller grabbed this person by the collar. Someone else then hit Eller in the back. When he started toward the fight someone grabbed him by the coat and told him to stay out of it. He tried to break loose but fell to the floor. He heard Eller holler, "My eyes, my eyes," and observed one man pulling Eller's face back while another pulled Eller's hands. He denied hitting anyone.

He next heard a shot and "saw this guy fall back against the bar." He then saw Eller get kicked in the face. Eller had a gun in his left hand and was "trying to hit a guy." He had not previously been aware that Eller had a gun. He grabbed Eller, told him to leave and then walked to his apartment where the police found him.

He identified People's Exhibit 14B as a gun taken from his apartment. He had not used this gun for three or four years. He denied going to Woody's Tavern on December 13, 1974, with a gun in his hand or pistol-whipping anyone. He also identified People's Exhibit 2 as similar to a gun his brother owned.

On cross-examination he denied threatening Pete Najera at the police station or seeing Warsa and Benito Najera enter Woody's Tavern, or carrying Eller's gun into the tavern, or hearing anyone say "Kill the Mexican bastards" or "Kill him. Kill them all." He further denied giving Eller the gun and telling him to leave. He left the tavern after the shooting because it was "not an everyday occurrence for me, so I don't know how to act."

*Cletus Ray Eller, on his own behalf*

He was employed by his brother, Willard Spaulding, as a carpenter.

On December 13, 1974, he was in Woody's Tavern with Spaulding but left before 8 p.m. At about 10 he received a phone call from Schmidt informing him that "Warsa and some Mexicans were shooting at us in Willard's back yard." He put his gun in his belt and drove to Spaulding's. When he found no one there, he went to Woody's. After talking to the bartender he went to the police station where he talked with Spaulding and Pantaliono. He, Spaulding and Schmidt left the station, ate at a restaurant, and then returned to Woody's.

As they entered the tavern, he pointed Warsa out to Schmidt. Schmidt began arguing with Warsa. Warsa, Tavitas and someone else then jumped Schmidt. He pulled Tavitas away by the collar and all five men began fighting inside the vestibule between the outside and inside doors of the tavern. He was on his knees and Tavitas was on his back, hitting him in the head. Tavitas "kept scratching in my eyes." He felt someone take the gun from his belt. He also grabbed for the gun, and he and the other man struggled for it. The gun went off and someone fell to the floor. The gun hit the floor. Tavitas kicked him in the head and tried to get the gun. He retrieved the gun first and started hitting Tavitas. Spaulding then told him, "You got to get out of here."

He left Woody's and drove to Hegewich where he abandoned the truck and "started wandering around." He threw the gun in an open sewer and "wound up in front of a police station" in Hammond, Indiana. He surrendered to the police and led them to the abandoned gun.

On cross-examination he stated that Spaulding did not fire the gun and that he did not yell, "Kill the Mexican bastards."

*Peter Gaona, Charles Hall and George Evans*

They testified as to the good reputations of Spaulding, Eller and Schmidt as law-abiding, peaceful and nonviolent men.

*For the State—Rebuttal*

*Patrick Ryan, Chicago Police Officer*

He heard Spaulding tell Pete Najera at the police station following the first incident that "that's all right because we are going to take care of you and your friends." However, he admitted on cross-examination that this statement was not included in his police report.

*Peter James Najera (Pete)*

He testified that on May 21, 1976, he had a conversation with Tom Pantaliono regarding Pantaliono's testimony against him on the aggravated assault charge. Pantaliono asked him if he was "worried about doing time." When he asked Pantaliono to stop coming to court to testify against him, Pantaliono replied that, "You don't know these guys. They are bad news. They'd just as soon kill you or me and run into the hills." Pantaliono also told him that, "I don't work for them anymore, but they make sure I come to court."

*Alfred Hernandez*

On December 14, 1974, at 1 a.m. he was in Woody's Tavern. He ordered a beer and went to the washroom. While in the washroom he heard a "hassle" in the bar. He went back to his seat at the bar and observed people fighting between the doors. Someone told him to stay out of the fight and took him into the kitchen at the rear of the tavern. He was able to watch the fight through the window in the kitchen door. He observed a man identified as Willard Spaulding pistol-whipping another man. Spaulding hit the other man 15 or 20 times. After he phoned the police he saw defendants kick the deceased and Tavitas as they left.

On cross-examination he admitted that he did not immediately tell the police what he had observed and that he is a friend of Benito Najera, Jr., son of the deceased.

The jury found Eller and Spaulding guilty of aggravated battery and also found Spaulding guilty of murder. Defendant Rick Schmidt was found not guilty. Eller and Spaulding now appeal their convictions.

OPINION

Defendants first contend the evidence adduced at trial was not sufficient to prove them guilty beyond a reasonable doubt.

Our supreme court has stated that "we will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt." (*People v. Stringer* (1972), 52 Ill. 2d 564, 568, 289 N.E.2d 631, 634.) We will reverse a conviction where the record leaves us with a grave and substantial doubt of defendant's guilt. (*People v. Willson* (1948), 401 Ill. 68, 81 N.E.2d 485.) It is, however, "the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence." *People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733, 734.

■■ In the present case, the State and defendants presented conflicting accounts concerning the shooting of Benito Najera. Warsa and Tavitas, witnesses for the State, each testified positively that Spaulding pointed the gun directly at the deceased and fired the fatal shot. Defendants concede that the gun from which the fatal shot was fired was owned by Eller and that they were present in the tavern at the time of the shooting. Eller testified, however, that the gun went off in his hand as he struggled for control of it with an unidentified person. Spaulding testified that he heard the shot and then observed the gun in Eller's hand. Spaulding denied shooting Benito Najera. These four men were the only witnesses who testified as to the actual shooting. The jury, after listening to the testimony in the context of the entire trial and observing the demeanor of the witnesses, obviously chose to accept the testimony of Warsa and Tavitas rather than that of Spaulding and Eller. This is clearly the jury's

prerogative. Where the evidence is irreconcilably conflicting it is the function of the trier of fact to ascertain the truth (*People v. Hammond* (1970), 45 Ill. 2d 269, 259 N.E.2d 44), and in such a case we will not substitute our judgment for that of the trier of fact. (*People v. Clark* (1964), 30 Ill. 2d 216, 195 N.E.2d 631.) After carefully reviewing the lengthy record in its entirety, we are unable to conclude that the State failed to prove defendants guilty beyond a reasonable doubt. The testimony of Warsa and Tavitas was certainly not unbelievable, and we see no reason for overturning the jury's determination of guilt.

Defendants' reliance upon *People v. Lenzi* (1976), 41 Ill. App. 3d 825, 355 N.E.2d 153, in support of their contention that the State's evidence is unbelievable is misplaced. In *Lenzi* we found the State's evidence to be "improbable and contradictory and contrary to human experience." (41 Ill. App. 3d 825, 837, 355 N.E.2d 153, 163.) Such is not the quality of the State's evidence here.

■■■ Defendants argue, however, that the testimony of three witnesses as to defendants' good reputations as peaceful and law abiding citizens was sufficient to raise a reasonable doubt as to their guilt. Although it is true that evidence of a defendant's good character is not to be disregarded (*People v. Lonzo* (1974), 20 Ill. App. 3d 721, 315 N.E.2d 256), such evidence is not proof of innocence. (*People v. Ricili* (1948), 400 Ill. 309, 79 N.E.2d 509.) In the present case we do not believe that the testimony regarding defendants' good reputations in the community negates the strong direct evidence of their guilt presented by the State.

■ Defendants also argue in support of their reasonable doubt contention that the jury's failure to find them guilty of aggravated battery against Warsa raises a reasonable doubt of their guilt as to Tavitas since both Warsa and Tavitas testified that they were pistol-whipped. We disagree. It is clear that the trier of fact is free to believe part of one's testimony without believing all of it. (*People v. Holverson* (1975), 32 Ill. App. 3d 459, 336 N.E.2d 88.) Moreover, the evidence as to the alleged aggravated battery of Warsa and Tavitas is not identical. Hernandez, the State's witness, testified that he observed Spaulding pistol-whipping only one man. Considering the extent of Tavitas' injuries and his testimony concerning his hospitalization, the jury could have reasonably believed that it was Tavitas who was pistol-whipped by Spaulding.

Defendants next argue, however, that they were denied their right to a fair trial because the trial court: (1) admitted irrelevant and prejudicial evidence regarding a gun and ammunition owned by Spaulding; (2) allowed impeachment of a defense witness with improper and prejudicial evidence; (3) admitted hearsay testimony; (4) allowed improper cross-examination of defense witnesses; and (5) failed to properly instruct the jury.

We shall consider each of these five contentions individually.

Defendants' first contention under the fair trial section is that the trial court erred in admitting evidence regarding the seizure of a revolver and ammunition from Spaulding's apartment and in allowing cross-examination of Spaulding concerning this weapon and ammunition. Officer Roberts testified that following the arrest of Spaulding, he recovered a .38-caliber revolver and three boxes of .38-caliber ammunition from Spaulding's apartment while searching for another defendant. Also, cross-examination of Spaulding elicited testimony that he did own the revolver and ammunition and that he had not fired the revolver for three or four years, the last time being in West Virginia.

While the State concedes that the revolver in question was not the murder weapon, it argues that the evidence was probative on the issue of whether Spaulding was involved in the earlier incident and that his involvement in that earlier incident would tend to establish his motive and intent in later murdering Benito Najera. Warsa testified for the State that Spaulding had used what appeared to be a .38-caliber revolver to threaten Pete Najera and during the robbery outside the tavern. Pete Najera also testified for the State that Spaulding took part in the robbery and that Spaulding hit him on the head with a gun. Defendants' version, however, was that Tom Pantaliono rather than Spaulding was involved in the first incident. They attempted to establish that Spaulding was not even present during the first confrontation.

While it may be true that the presence of a .38-caliber gun and ammunition in Spaulding's apartment had some relevancy on the question of his involvement in the first incident and that his involvement in that first incident was relevant on the question of whether he or Eller shot Benito Najera, we believe such relevancy was tenuous at best.

However, even if the admission of the gun and ammunition here had been improper, such error does not automatically require reversal. (See *People v. Pruitt* (1974), 16 Ill. App. 3d 930, 307 N.E.2d 142, *cert. denied* (1974), 419 U.S. 968, 42 L. Ed. 2d 184, 95 S. Ct. 232.) In *Pruitt* we stated that:

> "As the revolvers and the accessories could not be connected with the defendant they were inadmissible and should have been excluded. (*People v. Jones, supra.*) In light of all the evidence and testimony at trial, we find, however, that the erroneous admission of these items was harmless error and does not require us to reverse. See *People v. Evans* (1972), 7 Ill. App. 3d 52, 286 N.E.2d 576." 16 Ill. App. 3d 930, 942, 307 N.E.2d 142, 152.

We will not reverse a conviction where error has been committed unless it appears that justice has been denied or that the jury verdict may have resulted from such error. (*People v. Tranowski* (1960), 20 Ill. 2d 11,

169 N.E.2d 347, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290.) Upon a careful review of the record before us, we are convinced that the evidence establishing defendants' guilt was so overwhelming that the error, if any, was certainly harmless beyond a reasonable doubt. We do not believe that under the facts of this case the evidence admitted and the cross-examination of Spaulding concerning the guns were so prejudicial as to deny defendants a fair trial.

Defendants next contend that the trial court erred in allowing the State to impeach the testimony of defense witness Thomas Pantaliono with evidence of a statement which he allegedly made to Pete Najera.

■■ On cross-examination, the State questioned Pantaliono regarding a statement he allegedly made to Pete Najera on May 21, 1976. Referring to defendants and his reasons for testifying against Pete on the aggravated assault charge, Pantaliono allegedly told Pete, "You don't know these guys. They would just as soon kill you or me and then run into the hills." The State was apparently aware of this statement before Pantaliono began to testify, but did not disclose its existence to the defense until cross-examination of Pantaliono. Although Pantaliono denied having made this statement to Pete defendants maintain that had they known of Pete's proposed testimony they may have decided not to call Pantaliono as a defense witness. Defendants object to the impeachment of Pantaliono for three reasons. They first argue that this impeachment was improper because the State had failed to disclose to them in a timely manner the fact that Pete Najera would testify that Pantaliono made such a statement. It is true that section 114—9 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 114—9) requires that, upon motion of the defendant, the State provide the defense with a list of prosecution witnesses. Moreover, Supreme Court Rule 412 (Ill. Rev. Stat. 1975, ch. 110A, par. 412) expands upon this requirement by also directing the State to provide the defense with statements of witnesses or summarizations of statements. However, section 114—9(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 114—9(c)) specifically provides that the list of witnesses requirement does not apply to rebuttal witnesses, and case law has applied this same exclusion to the requirements of Supreme Court Rule 412. (*People v. Hope* (1974), 22 Ill. App. 3d 721, 318 N.E.2d 128; *People v. Porter* (1973), 13 Ill. App. 3d 893, 300 N.E.2d 814.) In the present case Pete Najera was called by the State in its case-in-chief and as a rebuttal witness. Defendants do not contend that the State failed to inform them that he would testify in their case-in-chief. The statement to which they object, however, was clearly presented by Pete Najera in his capacity as a rebuttal witness. Accordingly, we do not believe the State was under a duty to disclose Pete Najera's rebuttal statement to the defense.

■■ Moreover, even had the State been under a duty to disclose the statement, "[t]here is no mandate that a court respond to a failure to disclose evidence during discovery by excluding it." (*People v. Pickett* (1976), 35 Ill. App. 3d 909, 914, 342 N.E.2d 766, 770.) Here the trial court, upon learning of the State's intention to impeach Pantaliono, ordered the State to turn over to the defense certain notes made by the prosecutor during the conversation with Pete in which Pete told of Pantaliono's remarks. The trial court also allowed the defense an opportunity to confer with Pantaliono regarding the disclosure. Defendants did not request a continuance at that time. We do not believe that the trial court abused its discretion in allowing the impeachment here.

■■ Defendants' third contention concerning their failure to receive a fair trial is that the statement Pantaliono allegedly made to Pete Najera was inadmissible hearsay. We disagree. Hearsay is an out-of-court statement offered in court as proof of the matter asserted. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) Pantaliono's statement, however, was not admitted as proof of the matters asserted. Rather, as the trial court properly instructed the jury, it was offered only for the purpose of affecting Pantaliono's credibility as a witness, and, as such, was properly admitted. (See *People v. Smith* (1945), 391 Ill. 172, 62 N.E.2d 669; *People v. Newsome* (1972), 5 Ill. App. 3d 104, 283 N.E.2d 67.) We do not agree with defendants that the jury most likely ignored the limiting instruction given by the trial court and instead considered Pantaliono's alleged statement as substantive evidence of defendants' guilt of the offenses for which they were being tried.

■■ Defendants next contend that the trial court erred in permitting improper and prejudicial cross-examination of defense witnesses. However, defendants clearly failed to include this allegation of error in their written motion for a new trial. The failure of a defendant to raise an issue in his written motion for a new trial operates as a waiver, preventing the issue from being urged as a ground for reversal upon review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Although it is true that the waiver rule may be relaxed when the evidence is closely balanced (*People v. Todorovic* (1977), 53 Ill. App. 3d 1, 368 N.E.2d 471), we find no justification for dispensing with the general rule under the facts presented here since the errors complained of could not have deprived defendants of their right to a fair trial.

Defendants argue, however, that the trial court should have nevertheless excluded reference to the statement allegedly made by Pantaliono to Pete Najera because the unfair prejudice which it caused to them outweighed its probative value. They argue that they were unfairly portrayed as revengeful and violent persons. We do not agree. Pantaliono corroborated defendants' testimony concerning the first incident at

Woody's and discredited the testimony of Warsa and Pete Najera. Certainly Pantaliono's credibility was of substantial concern to the jury. Although Pantaliono's alleged statement concerning his reasons for testifying against Pete Najera on the aggravated assault charge was obviously prejudicial to defendants, we believe that the probative value of the statement on the issue of Pantaliono's credibility outweighed any prejudice to defendants and justified admission of the statement.

■■ Defendants' fifth and final contention regarding the denial of a fair trial is that the trial court failed to properly instruct the jury. They argue that the court failed to instruct the jury on the definition of "reasonably believes" as it pertains to justifiable use of force and that the State must prove defendants were not justified in using the force which they used. Specifically, they argue that Illinois Pattern Jury Instructions, Criminal, Nos. 4.13 and 25.05 (1968) should have been given to the jury. However, defendants clearly failed to include this allegation of error in their written motion for a new trial. Defendants therefore waived this contention by not raising the point in their post-trial motion. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Flowers* (1977), 52 Ill. App. 3d 301, 367 N.E.2d 453.) Defendants also argue that the trial court erred in failing to instruct the jury regarding death by accident or misadventure. However, the trial court did instruct the jury that the State was responsible for proving that defendants intended to kill Benito Najera, knew that their acts would cause death or great bodily harm to him, or knew that their acts created a strong probability of death or great bodily harm. Therefore, the jury could not have found defendants guilty had they determined that Benito's death was the result of accident or misadventure. Under these facts an instruction on accidental death would clearly have been both superfluous and unnecessary, and the trial court acted properly in refusing it. See *People v. Lyons* (1976), 44 Ill. App. 3d 802, 358 N.E.2d 1183.

In conclusion we note that defendants are, of course, guaranteed a fair trial, but not one necessarily free of error. (*People v. Ashley* (1960), 18 Ill. 2d 272, 164 N.E.2d 70, *cert. denied* (1960), 363 U.S. 815, 4 L. Ed. 2d 1157, 80 S. Ct. 1255.) As this court stated in *People v. Castillo* (1976), 40 Ill. App. 3d 413, 420, 352 N.E.2d 340, 347:

> "The purpose in reviewing a criminal case is to determine whether a just verdict has been rendered, upon sufficient competent evidence, after a trial in which no error prejudicial to defendant's rights has occurred rather than a determination of whether the record is error free. [Citation.] Where it appears that the errors in the record could not have reasonably affected the result, the errors are harmless and the judgment of conviction should be affirmed."

After reviewing the entire record before us and considering the overwhelming evidence of defendants' guilt, we conclude that any error which may have occurred during the trial was harmless beyond a reasonable doubt and did not prevent defendants from receiving a fair trial.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.