**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230346-U

Order filed June 20, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0346 Circuit No. 22-DV-1250 |
| | ) | |
| LAUREANO TAN JR., | ) ) | Honorable Christine T. Cody, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1       *Held*:   (1) Defendant forfeited his claims of evidentiary error; and (2) the State proved defendant guilty of domestic battery beyond a reasonable doubt.

¶ 2       Defendant, Laureano Tan, Jr., argues that (1) the cumulative effect of the Du Page County circuit court's alleged evidentiary errors deprived him of his right to a fair trial, and (2) the State failed to prove him guilty beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On September 22, 2022, the State charged defendant with 10 counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (2) (West 2022)) and criminal trespass to a residence (*id.* § 19-4(a)(1)). The charges alleged that defendant entered the residence of Alessandra Miceli, his former girlfriend, without authority and committed several acts of domestic battery of an insulting and provoking nature resulting in bodily harm. The matter proceeded to a bench trial.

¶ 5        During opening statements, defense counsel asserted that the evidence would show that Miceli had a history of "blacking out from over indulging [*sic*] from becoming inebriated," and "pill popping Adderall," which she had done on the night in question. Defendant would identify Adderall pills and testify that he observed Miceli consume Adderall that night. Counsel also asserted that Miceli "refused all examinations for more than a whole day" and never "submit[ted] to a blood test at a hospital" that would have determined her blood alcohol concentration. The court interjected, stating that "whether or not [Miceli] had her blood drawn for being the victim of an alleged domestic battery is not relevant and it's not properly the subject of [an] opening statement."

¶ 6        Miceli testified that she and defendant ended their nearly five-year relationship several weeks before they attended a mutual friend's wedding together on November 27, 2021. Defendant left his dog at Miceli's apartment, reserved a hotel room, and drove Miceli to the wedding. Miceli brought an overnight bag in the event she stayed the night. After checking into the hotel, she drank whiskey with friends. Miceli had three glasses of wine at the wedding but was not sure how much alcohol defendant consumed. A friend offered Miceli and defendant a cannabis edible, which she declined but defendant accepted. The State asked Miceli about this fact in several different ways. Each time, defense counsel objected to the questions for lack of foundation or leading the witness. The court overruled the objections and told counsel he would

"have to live with" the rulings but noted counsel's continued objection. The State asked the question again, and defense counsel objected based on hearsay. The court overruled the objection, finding that it went to Miceli's "state of mind[.]"

¶ 7        Later in the night, Miceli accepted a ride home with a friend, and defendant seemed surprised that Miceli was not going to stay at the hotel with him. On her way home, defendant called and yelled at Miceli, asking why she "fucking left." Miceli described defendant as "really angry." When Miceli arrived home, she had a drink with a neighbor and then invited her friend Matt to her apartment. At approximately 3:30 a.m., Miceli and Matt were undressed in her bed after "sleep[ing]" together when defendant stormed into her residence yelling. Defendant told Matt to "get out," and Matt started to get dressed. As Miceli began dressing, defendant "punched [Miceli] with a closed fist right across [her] face." Miceli stated that her "head started spinning," she was "in shock," and "feeling a lot of pain." Miceli then heard defendant scuffling with Matt outside her room.

¶ 8        During this time, Miceli hid in her bedroom closet because she was afraid. Defendant reentered Miceli's bedroom, knocking over her nightstand, and saying "where the fuck are you." Eventually, defendant located Miceli, "grabbed" her waist, and "dragged" her out of the closet. Defendant then used his right hand and punched Miceli three or four times on the left side of her face, hitting her ear, eye, and nose. Soon after, defendant backed her against the wall and threw wine in her face. Miceli "snapped," yelled at defendant to "get out," and pushed defendant out of her room. Defendant "shoved [her] on [her] chest *** launch[ing]" Miceli, causing her head to hit the wall. Miceli fell "and started peeing" from fear. Miceli screamed "as loud as [she] possibly could" and tried try to push defendant out of her apartment. Defendant "grabbed [her] by the shoulders and tossed [her]." Defendant moved his bag and his dog that was in a carrier

3

into the hallway but prevented Miceli from shutting her door and eventually pushed the door open, reentering the apartment. Miceli exited and threw defendant's bag over the railing. Miceli picked up the dog carrier, but did not throw it. When defendant went after his bag, Miceli closed and locked her door.

¶ 9 In the afternoon of November 28, Miceli reported the incident to police who took photographs of her bruised eye. Miceli described having "stabbing, seering [*sic*]" pain in her eye and the inability to tolerate light. Several days after the incident she was diagnosed with a severe concussion. Within the same week, Miceli went to the police station and had photographs taken of her developing injuries. The photographs showed Miceli's black eye, bruises on her arm, shoulder, and a scratch on her ear. Defense counsel objected and argued that the State did not establish "who took the pictures or when they were taken." The court admitted the photographs, stating that was "not relevant" to the foundation and Miceli established that the "photographs truly and accurately reflect[ed] what her body looked like" at the time the photographs were taken.

¶ 10 On cross-examination, Miceli stated that she left the wedding because she "got the feeling that [defendant] thought that something was going to happen" between them, and she did not want to stay in the hotel room with him. When Miceli returned home, she had less than two alcoholic beverages. Miceli denied becoming inebriated or "overly intoxicated," blacking out, losing consciousness, or consuming shots of alcohol or Adderall. Miceli clarified that she "was intoxicated, but *** not to the point where [she] *** was slurring [her] words." Miceli denied falling out of bed and hitting the treadmill or otherwise losing her balance except for when defendant pushed or threw her. Miceli did not know whether defendant had called to inform her he was on his way to her residence because her phone was in another room. Defense counsel

4

asked several questions about Matt and Miceli's relationship and communication on that night, which the court stated were "not relevant." The court noted that counsel's questions were "bordering on badgering the witness" and struck the testimony from the record.

¶ 11     On redirect examination, Miceli indicated that she was unable to complete a written statement due to the severity of her concussion and the pain she was experiencing, but she gave a video recorded statement. Defense counsel informed the court that it had a few questions for the witness, and the court responded, "I didn't ask for recross. I'm not granting recross. *** The redirect was based on the cross and it didn't open up any other areas."

¶ 12     Officer Anthony Poli testified that he responded to Miceli's domestic violence report on November 28, and observed her to be "a little emotional, crying, [and] a little shaky." Miceli indicated that she felt "a little foggy" and "lightheaded." On December 6, Poli observed and took photographs of Miceli's "more developed" and "[d]arker, deeper color" injuries at the police station.

¶ 13     On cross-examination, Poli stated that he could not locate Matt to complete an interview. Counsel asked, "Miceli told you that she decided to get a ride home from one of her girlfriends, and that she informed [defendant] that she was going to do that. Correct?" The court sustained the State's hearsay objection and stated that the question was not impeachment because it was Miceli's "exact[ ]" testimony. Counsel asked several questions about the nature of Miceli and Matt's relationship. When the court inquired as to the relevance of the questions, counsel insisted it was impeachment. The court sustained the State's objection stating that it was not material to the cause of action or relevant to weighing Miceli's credibility.

¶ 14     Defendant testified that before driving Miceli to the wedding, he left his dog at Miceli's residence and planned to pick the dog up the next day. When they arrived at the hotel, both he

5

and Miceli received a room key, used the room to change their clothes, and planned to stay in the room overnight. Miceli drank whiskey in the two hours they spent at the hotel before the wedding. Defendant and Miceli consumed alcohol at the wedding. At approximately 9 p.m., Miceli told defendant she was leaving, and defendant assumed she was returning to the hotel. Later, defendant learned that Miceli had gone home. He did not understand why Miceli left the wedding. Defendant testified that he did not plan to have sexual intercourse with Miceli. At this point, the court interjected, "I want to let you know, as far as timing goes, at 4[:]15. We are going to be finished. I would ask the questions that you think are the most relevant, because otherwise, we'll be continuing the rest of the trial until tomorrow afternoon. Okay. *** You may continue."

¶ 15        At approximately 10 p.m., defendant left the reception and returned to the hotel. Defendant was "a little upset" that Miceli left because he "just assumed" that she would stay. When defendant was unable to sleep because he was "just thinking about a lot of things," he decided to pick his dog up from Miceli's apartment and left the hotel at 1 a.m. Defendant told Miceli over the phone that he was coming, and she said "Okay." Defendant let himself into Miceli's residence, and "went to go check in on [Miceli] and then found *** two naked people in the bed." Defendant described the room as "very dark" but soon recognized Miceli and Matt, who were "not in good shape" and "very drunk." Defendant observed Miceli exit the bed and "[fall] over right away getting out of the bed[,]" striking her head on a treadmill. When Miceli got up, she fell again. Defendant argued with Matt because he could not "believe [Matt] would do this," and they began pushing each other. Miceli put herself in the middle of defendant and Matt while they punched each other. Defendant did not see Miceli get hit but heard her say, "I'm

getting hit." Defendant did not strike or shove Miceli while he punched Matt or at any other time.

¶ 16 Eventually, Matt left, and defendant tried to talk to Miceli, who "just started screaming *** telling [defendant] to get out." Defendant put his dog in the carrier, but Miceli would not allow him to get his bag. Miceli threw the dog and dog carrier down six to seven stairs and told defendant to "get the fuck out."

¶ 17 At this point in his testimony, defendant stopped and informed the court that he was "distract[ed]" by people laughing in the courtroom gallery. Counsel objected and asked for the individuals to be removed from the courtroom. The court noted his objection and instructed the individuals to "maintain their composure." When defendant complained he was still distracted by the continued "smirking," the court suggested that defendant "focus" on his attorney and explained that "the question about the dog just took everyone off guard[.]"

¶ 18 On cross-examination, defendant stated that he believed Miceli would spend the night in the hotel room in the same bed despite having ended their relationship. Defendant was offended to find Matt naked in bed with Miceli. While inside Miceli's residence, defendant observed Miceli fall "several times" but could not see where she hit her head because the room was dark. Defendant denied striking Miceli in the face. Defendant testified that he sustained "[p]ossible scratches" on his neck but did not report the physical altercation with Matt to police. Defendant denied pulling Miceli from the closet, punching her in the face, and pushing her against the wall. Defendant was "confused" and not "upset" when he found out Miceli left the wedding.

¶ 19 On redirect examination, defendant stated that he consumed a cannabis edible. Defendant observed Miceli consume an Adderall pill, drink alcohol, and become intoxicated at the

7

reception. Defendant testified that he knew Miceli consumed Adderall because he observed her take Adderall twice a week for approximately one year.

¶ 20    Following closing arguments, the court found defendant guilty of eight counts of domestic battery and not guilty of two counts of domestic battery and criminal trespass to residence. The court stated that it "did not find this to be a difficult case to decide" and relied on the physical evidence that corroborated Miceli's version and "the plausibility of the events as they were testified to." The court found Miceli "quite credible on the stand[,]" noting that the details she did not remember bolstered her credibility because "she was not going to fabricate." The court found Miceli credible despite her alcohol consumption and did not believe that the consumption "impaired her ability to know what was going on around her or to be able to recount it." The court contrasted this with defendant who admitted to consuming both alcohol and cannabis and did not find defendant's testimony identifying an Adderall pill credible. The court also found several aspects of defendant's testimony implausible, including that he informed Miceli that he was coming over, that he did not initially recognize Miceli or Matt when he entered Miceli's bedroom, and that Miceli hit her head on the treadmill. The court also noted that defendant refused to admit that he was mad Miceli left the wedding but later acknowledged that he was upset. The court believed that anger prompted defendant's decision and the events ensued as Miceli had described. The court concluded that Miceli testified credibly and defendant "made up events as he went along." The court sentenced defendant to one year of probation.

¶ 21    On June 12, 2023, defense counsel filed a motion for a new trial. Counsel alleged, *inter alia*, that the court exhibited prejudice by: (1) "interrupting defense counsel multiple times during opening statement to posit that [Miceli] was the 'victim' " and "*sua sponte* interrupting defense counsel multiple times during cross-examination;" (2) "disallowing the defendant to

cross examine [Miceli] about her drug usage on the date of the incident;" and (3) allowing audience members to remain in the courtroom after defense counsel objected. Counsel also generally asserted that the court erred by sustaining the State's objections and overruling counsel's objections during the direct examination and cross-examination of Miceli. The motion also stated that the State failed to prove defendant guilty beyond a reasonable doubt. The court denied defendant's motion, and he appeals.

¶ 22                                    II. ANALYSIS

¶ 23                              A. Cumulative Court Error

¶ 24        On appeal, defendant first alleges he was denied a fair trial based on the cumulative effect of "erroneous evidentiary" rulings resulting in the court's "misapprehension, hostility [or] predisposition," including: (1) asserting that Miceli's failure to submit to toxicology testing "was not relevant;" (2) allowing Miceli to provide hearsay testimony regarding defendant consuming a cannabis edible; (3) asserting that it was "not relevant when the photos [of Miceli's injuries] were taken;" (4) prohibiting defense counsel from a recross-examination of Miceli; (5) preventing counsel from impeaching Miceli with her prior inconsistent statement; (6) "urg[ing]" counsel to ask "the most relevant questions, lest the trial be continued;" (7) excusing the laughter of audience members instead of reprimanding them; and (8) finding defendant's identification of Adderall incredible.

¶ 25        At the outset, we note that defendant failed to preserve any of the cumulative error claims for appellate review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appellate review, a defendant must object to it at trial and raise it in a posttrial motion); see also *People v. Woods*, 214 Ill. 2d 455, 470 (2005) ("[A] defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for

9

review."). To preserve a claim for appeal, the circuit court must have "clearly had an opportunity to review the same essential claim that was later raised on appeal[.]" *People v. Heider*, 231 Ill. 2d 1, 18 (2008). When a defendant forfeits appellate review of a claim of error, we may only consider the claim when defendant establishes that a plain error occurred. See Ill. S. Ct. R. 615(a).

¶ 26    Here, the court did not have an opportunity to review defendant's claims where he did not raise "the same essential" arguments in his posttrial motion. See *Heider*, 231 Ill. 2d at 18. First, defendant made generalized claims regarding the court's error in sustaining the State's objections and overruling counsel's objections during direct and cross-examination of Miceli. These claims were imprecise and insufficiently specific to allow the circuit court to form a ruling adequate for our appellate review. See *Woods*, 214 Ill. 2d at 470. Second, while defendant alleged that the court mishandled laughing audience members, he did not specifically object to the court's failure to reprimand audience members and instead contended that the court erred in denying his request to remove them from the courtroom. See *Enoch*, 122 Ill. 2d at 186. Third, defendant raises entirely new issues on appeal. For example, defendant argues that the court erred in (1) stating Miceli's failure to complete toxicological testing was irrelevant, (2) improperly allowing hearsay testimony, (3) stating that when the photographs of Miceli's injuries were taken was irrelevant, (4) prohibiting recross-examination of Miceli, (5) preventing impeachment of Miceli, (6) improperly curbing defendant's direct examination, and (7) finding defendant's identification of Adderall incredible. None of these arguments were specifically raised in defendant's posttrial motion. See *id.* Additionally, defendant does not argue for plain error review or provide any other reason why this court should excuse his forfeiture. See *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010) ("when a defendant fails to present an argument on how either of the two prongs

10

of the plain-error doctrine is satisfied, he forfeits plain-error review"). Therefore, we must honor his procedural default.

¶ 27                                    B. Sufficiency of the Evidence

¶ 28        Next, defendant contends that the State failed to prove him guilty of eight counts of domestic battery beyond a reasonable doubt. Specifically, defendant asserts that the court erred in finding Miceli's testimony credible when she was under the influence of alcohol, as evidenced by her admission "to consuming a copious amount of alcohol on the night in question." Defendant reasons that "Miceli's degree of inebriation *** and foggy recollection of the events that transpired severely undermined her reliability" and maintains that "[s]ince she had imbibed enough liquor to kill a horse, her testimony should have been taken with a grain of salt."

¶ 29        When a defendant makes a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Thus, we afford great deference to the trier of fact "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). We will not retry a defendant and must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

11

¶ 30    To prove defendant guilty of domestic battery, the State had to establish that defendant knowingly, without legal justification, made physical contact of an insulting and provoking nature with Miceli, a former domestic partner, resulting in bodily harm. See 720 ILCS 5/12-3.2(a)(1), (2) (West 2022). The charges defendant was convicted of indicated that defendant "struck *** Miceli about the face," made contact by "grabb[ing] *** Miceli about the arms," and made contact by "push[ing] *** Miceli into a wall."

¶ 31    In this case, Miceli testified that defendant: (1) entered her bedroom and punched her in the face with a closed fist, inflicting pain; (2) dragged her out of her closet and punched her in the face three or four more times; (3) shoved her into a wall, causing her to fall to the floor; and (4) grabbed her and tossed her to the floor before leaving her residence. Miceli further testified that she suffered head pain for several days and had a severe concussion. In support of her statements, Poli testified that shortly after the incident, he observed Miceli's "shaky" demeanor and later took pictures of her injuries. Additionally, photographs admitted into evidence showed Miceli's black eye, bruises on her arm and shoulder, and a scratch on her ear, corresponding with Miceli's description of each separate battery and further corroborating her account.

¶ 32    More important, the court found Miceli credible. The court compared Miceli and defendant's testimony and found Miceli's version of events to be "plausib[le]," "quite credible," and corroborated by the physical evidence. The court stated that the facts Miceli could not remember bolstered her credibility because Miceli "was not going to fabricate" facts. In coming to this conclusion, the court specifically considered Miceli's alcohol consumption, but found that it had not "impaired her ability" to know and recount what happened to her. In contrast, the court found defendant's testimony incredible, implausible, and believed that defendant "made up events as he went along." Though some of defendant's testimony inherently corroborated

12

Miceli's, including that defendant consumed alcohol and drugs at the wedding, the court was not required to believe all of defendant's testimony. See *People v. Spaulding*, 68 Ill. App. 3d 663, 675 (1979) ("the trier of fact is free to believe part of one's testimony without believing all of it"). We agree with the court and see no reason to substitute our judgment for the court's credibility determinations. See *Jackson*, 232 Ill. 2d at 280-81; see *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007) (because the trier of fact is best equipped to determine the credibility of a witness, we afford great deference to such credibility determinations unless the determination is unreasonable). Therefore, in the light most favorable to the State, sufficient evidence was presented to sustain defendant's convictions for domestic battery.

¶ 33                                III. CONCLUSION

¶ 34        The judgment of the circuit court of Du Page County is affirmed.

¶ 35        Affirmed.