(No. 46665.—▮▮▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. GERALD DeMORROW, Appellant.

*Opinion filed November 27, 1974.*

Robert E. Davison, Office of State Appellate Defender, of Springfield, for appellant.

William J. Scott, Attorney General, of Springfield (James B. Zagel and John Patrick Healy, Assistant Attorneys General, both of Chicago, of counsel), for the People.

MR. JUSTICE DAVIS delivered the opinion of the court:

This case arises from the trial in the circuit court of Vermilion County of the defendant and James Brandys, who is not a party to this appeal, on charges of aggravated kidnapping, unlawful restraint, rape, and indecent liberties with a child. The court directed verdicts in favor of the defendants on the charges of rape and indecent liberties at

the end of the prosecution's case. The jury found the defendants to be guilty of aggravated kidnapping and unlawful restraint. Judgment was entered on the verdict, and the appellant was sentenced to 10 to 25 years in the penitentiary on the aggravated-kidnapping conviction. The appellate court affirmed (17 Ill. App. 3d 901), and we granted leave to appeal.

The appellant raises only three issues in this court: that the courts below erred in concluding that evidence discovered in the defendant's home in the State of Michigan was the result of a valid consent search; that he was not proved guilty beyond a reasonable doubt; and that the sentence was excessive. The appellate court was of the opinion that the Supreme Court of Michigan would require that a person be given a *Miranda* type of warning before consent to a search without a warrant could be valid. The appellate court relied on the case of *People v. Zeigler* (1960), 358 Mich. 355, 100 N.W.2d 456, and ended its discussion with the following statement at 17 Ill. App. 3d 901, 908:

"That is, the Michigan court said that both the fourth and fifth amendments involve the protection of privacy and guard against the compulsory production of incriminating evidence so to assure a waiver of such fundamental constitutional rights is voluntary, a warning of the protection provided and the right not to waive it is required.

The Supreme Court of Michigan, in *People v. Zeigler,* 358 Mich. 355, 100 N.W.2d 456, after first discussing the interplay of the fourth and fifth amendments, stated:

"And so, with respect to incriminating evidence, other than confessions, obtained by search and seizure, under a conceivable showing of facts, such as, *inter alia,* that the accused was first advised of his rights, informed that he need not submit to a search and that, if he did, the fruits thereof would be used in evidence against him, his

consenting to the search and seizure may well, in the absence of contrary indications, be held to be voluntary, not an involuntary act secured under coercion, and, hence, a waiver of his constitutional rights, rendering such evidence admissible." 358 Mich. at 364-365, 100 N.W.2d at 461.

In *Zeigler*, the Michigan court was deciding what safeguards were required by the fourth and fifth amendments to the United States Constitution, and not the safeguards required by the Constitution of the State of Michigan. The Supreme Court of Michigan has also stated that:

"It is beyond all question that the United States supreme court is the sole authoritative interpreter of the United States Constitution; and that it speaks only through opinions adopted by the majority of the court. *People v. Gonzales* (1959), 356 Mich. 247, 262-263, 97 N.W.2d 16, 24.

Therefore, whether or not any given search and seizure is unconstitutional, as violative of the fourth and fifth amendments, as a matter of substantive law, is to be decided by the pronouncements of the United States Supreme Court. If a search and seizure is valid according to the opinions of the United States Supreme Court, the decision of a State court cannot make it invalid as a matter of Federal constitutional law. The decision of what State courts deem to be admissible in their systems according to their laws of evidence is an entirely separate question.

The United States Supreme Court considered this question of the characterization of exclusionary rules in the State courts in the case of *Salsburg v. Maryland* (1954), 346 U.S. 545, 98 L. Ed. 281, 74 S. Ct. 280, and the court stated:

"Rules of evidence, being procedural in their nature, are peculiarly discretionary with the law-making authority, one of whose primary

responsibilities is to prescribe procedures for enforcing its laws. Several states have followed diametrically opposite policies as to the admission of illegally seized evidence. [Citations.]" 346 U.S. at 550, 98 L. Ed. at 287.

Inasmuch as the question raised by the defendant is one of evidence, the law of Illinois, the forum State, is applicable. *People v. Saiken* (1971), 49 Ill.2d 504, 509; *People v. Kirkpatrick* (1953), 413 Ill. 595, 597.

We look then to the question of whether the search and seizure in this case meets constitutional standards as set forth by the United States Supreme Court. The witnesses do not agree on the events which led to the search. At the hearing on the defendant's motion to suppress, contradictory testimony was given. Thomas Mannin, a Sergeant on the Hoopeston, Illinois, police force, who was present when the defendant was arrested in his home in Michigan, testified in pertinent part as follows:

"[Direct examination:]

Q. State your name please.

A. Thomas Franklin Mannin.

Q. And what is your occupation?

A. I am a sergeant on the police force in Hoopeston, Illinois.

Q. That is in Vermilion County, Illinois?

A. Yes it is."

The following testimony was from the cross-examination of Thomas F. Mannin:

"Q. When you went in the house where did you see Mr. DeMorrow?

A. He was coming out of one of the bedrooms with Trooper Den Houten.

Q. With the Trooper?

A. Yes.

Q. What did Trooper Den Houten say?

A. He informed him of his rights, told him he was under arrest for an alleged incident in Illinois and violation of his parole.

Q. What were you doing at that time?

A. I was standing along side.

Q. Then what did you do at that time?

A. What did I do?

Q. Yes.

A. Then I asked Mr. DeMorrow—I explained his rights to him, asked him about the clothing I testified earlier he had worn on the weekend.

Q. What did he say?

A. He said yes, he had been wearing a yellow shirt over the weekend, went to the dirty clothes, got these shirts, I asked if we could take them.

Q. You say he went into the corner?

A. No, in the clothes closet.

Q. He left the room where you had been detaining him?

A. No, right in this visible area, two rooms were adjacent, to my knowledge there was no visible partition or doorway, he walked right in and we walked with him, he got these two articles and brought them to me.

Q. Then what happened thereafter?

A. I asked if he would voluntarily consent we could take them back—I could take them back with me. He said yes he would. I asked if he owned a blue vest, gave him a description of it, he said he didn't. I asked if we could also search the property for that, I asked Miss Koch, she said yes I could.

Q. Did you find such a vest?

A. Yes I did."

Trooper Robert Den Houten of the Michigan State Police gave the following account of the search at the hearing on the defendant's motion to suppress:

"[Direct Examination:]

Q. Were you present when any articles were taken from the DeMorrow house?

A. Yes, sir, I was.

Q. What do you recall about that?

A. Well Detective Mannin was looking for certain clothing, in particular for one that was worn the night of the crime, and he asked DeMorrow if he had any yellow shirts, anything to that effect. DeMorrow said 'yes, I have got a yellow shirt.' I said, 'Where is it?' and he said, 'In here.' DeMorrow started to walk over, he said, 'I will get it.' He found it in a bunch of dirty clothes, or something,

and then there was a vest mentioned which was in an adjacent room and he also asked if had a vest of that description. He said, 'No I don't.' Detective Mannin said, 'Do you mind if we look around?' And he said, 'Go ahead, look around. All you want to.' So he went in another room, a back bedroom, he came out with this black vest, charcoal colored vest. DeMorrow said, 'This is not mine. That is Alice Koch's.' She said, 'Well that is not mine either.'

Q. Do you remember how many shirts were taken or found?

A. I remember one yellow one and the vest, there may be some yellow ones, I recall one in particular.

Q. You said in regard to the shirts, you say that was in a hamper of some kind?

A. Either in the hamper or a pile of dirty clothes. I can't recall. It was where the wash was piled up.

Q. Was it in view?

A. In the same bedroom he was in when we arrested him.

Q. Was it in view or did you have to lift something up?

A. Probably covered up or something.

Q. How did you know where to look?

A. He told us.

Q. He pointed?

A. He said it is in this room here.

Q. Did he indicate where?

A. In this room, of course the room was real small. Detective Mannin went in and got it.

Q. Did you see the defendant in the same room he was arrested in?

A. Yes.

Q. At any time did Mr. DeMorrow say anything in the way of an objection to your taking any of these items of clothes?

A. He got a little bit upset when Detective Mannin found the vest. Before he found the vest there, he was all cooperation.

Q. How did he get upset when the vest was found?

A. He said, 'That is not mine, doesn't belong to me.'

Q. Up until they pulled the vest out, he didn't say anything?

A. No."

However, the defendant gave the following testimony at the same hearing on his motion to suppress:

"[Direct Examination:]

Q. Did they exhibit any warrant of any type to you?

A. No.

Q. What part of the house were you in when you were arrested?

A. I was in the bedroom.

Q. After they arrested you, what did they do?

A. Held me in the kitchen handcuffed, Officer Mannin searched the house.

Q. What part of the house did they search?

A. My bedroom. My daughter's bedroom.

Q. Did you give them permission to search the house?

A. No I did not.

Q. Anyone else give them permission?

A. No.

Q. What part of the bedroom did they search?

A. Both my closet and my dresser.

Q. Did they find anything in any of those places?

A. They took two of my shirts and a vest that belonged to my wife.

Q. Describe the shirts?

A. A gold button down, one gold slipover, a vest, blue denim."

In *People v. Peterson* (1959), 17 Ill.2d 513, at pages 514 and 515, the court stated: "Whether consent has been given in the particular case is a factual matter to be determined in the first instance by the trial court, and where the evidence on the issue is in conflict this court will accept the finding below unless it is clearly unreasonable. (*People v. Mathews,* 406 Ill. 35; *People v. McDonald,* 365 Ill. 233; *People v. Reid,* 336 Ill. 421.) Because a court of review is not in a position to observe the witness as he testifies, questions of credibility and the weight to be given his testimony must be left largely in the discretion of the trial court."

The validity of the search in this case is dependent upon which testimony concerning events leading up to the

search is to be believed. This court, in *People v. Haskell* (1968), 41 Ill.2d 25, 30-31 (overruled in part on other grounds in *People v. Nunn* (1973), 55 Ill.2d 344), faced a similar problem concerning the consent of a third party, and in *Haskell,* at pages 30 and 31, the court stated: "The trial judge here made no express findings as to which testimony he believed or disbelieved, but his denial of the motion to suppress implies that he must have discredited the testimony of the defense witnesses since that testimony demands a contrary ruling on the motion. (See *Commonwealth v. Wright,* 411 Pa. 81, 190 A.2d 709.) It follows that we are bound to accept the testimony given by the police detectives as true because it cannot be said that it is clearly unreasonable. We are not similarly bound, however, to accept the trial court's ruling on the motion if, as a matter of law based on the facts as established by that testimony, it cannot be said that a legally sufficient consent was given. In other words, the relative credibility of the witnesses is not the issue before this court. The real issue is whether the testimony of officers Lee and O'Neil, taken at full value, meets the required standards for consent."

We turn then to the question of whether the search was conducted with the defendant's consent under the meaning of the United States Constitution.

There has been no definitive decision of the United States Supreme Court on the question of whether one who is already in custody need be informed of his fourth amendment rights before an effective waiver of those rights can be effectuated. That court has, however, recently considered the case of effective waiver of fourth amendment rights when the subject of the search is not in custody. In *Schneckloth v. Bustamonte,* 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041, the specific holding of the court was quite narrow, and not directly applicable to the case at bar. The court stated:

"Our decision today is a narrow one. We hold

only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." 412 U.S. at 248-9, 36 L. Ed. at 875.

The court specifically found the standard of *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019, to be inapplicable to consent searches. The court traced the reason for the enunciation of that standard, *i.e.,* "an intentional relinquishment or abandonment of a known right or privilege," from the context of the safeguards of a fair criminal trial, both in its inception and its extension. Generally, the law of searches and seizures, as revealed by the court's decisions, is the product of interplay of the fourth amendment's guaranty against unreasonable searches and seizures, and the fifth amendment's guaranty that no person shall be compelled in a criminal case to be a witness against himself, the dual purpose being to protect the privacy of the individual and to protect him against compulsory production of evidence to be used against him. (*Boyd v. United States* (1886), 116 U.S. 616, 29 L. Ed. 746, 6 S. Ct. 524; *Weeks v. United States* (1914), 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341.) The test given for consent searches is whether the consent was given voluntarily.

In *Schneckloth v. Bustamonte,* 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041, the test of voluntariness used by the court was discussed in the following terms:

"*** that the question whether a consent to a search was in fact 'voluntary' or was the product of duress of coercion, express of implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." 412 U.S. at 227, 36 L. Ed. 2d at 862-3.

"*** Rather, it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." 412 U.S. at 233, 36 L. Ed. 2d at 866.

"It is also argued that the failure to require the Government to establish knowledge as a prerequisite to a valid consent, will relegate the Fourth Amendment to the special province of 'the sophisticated, the knowledgeable and the privileged.' We cannot agree. The traditional definition of voluntariness we accept today has always taken into account evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights; and the voluntariness of any statement taken under those conditions has been carefully scrutinized to determine whether it was in fact voluntarily given." 412 U.S. at 247-8, 36 L. Ed. 2d at 874-5.

In the present case both peace officers testified that the defendant was informed of his *Miranda* rights before the search. Although there is some discrepancy in their testimony as to the manner in which the search was accomplished, these discrepancies are not of sufficient scope to establish that the testimony is unreasonable. It is

sufficient under the tests set forth above for voluntariness that the defendant consented to the search. Also under the testimony of Detective Mannin, Alice Koch consented to the search, and her consent may well be sufficient independent justification. *United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988.

In view of our ruling that the consent to the search was voluntarily given, we find no merit in the contention that the defendant was not proved guilty beyond a reasonable doubt, and under the flagrant circumstances of this case, we do not find the sentence to be excessive.

Therefore, we find that the circuit court of Vermilion County did not err in denying the defendant's motion to suppress, and the judgment of the appellate court is affirmed.

*Judgment affirmed.*