THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KIMBERLY BRANHAM, Defendant-Appellant.

Second District   No. 2—84—0493

Opinion filed October 23, 1985.

G. Joseph Weller and William A. Delaney II, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE NASH delivered the opinion of the court:

After trial by jury defendant, Kimberly Branham, was convicted of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) and sentenced to a term of 30 years' imprisonment. Defendant appeals, contending the trial court erred in denying her pretrial motion to suppress evidence and that the sentence was excessive.

Evidence at trial disclosed that at the time of the offense on January 2, 1984, defendant was a 17-year-old high school senior who had been engaged in a close lesbian relationship with her classmate, Betsy Lou, for about two years. In the fall of 1983, the relationship deteriorated as Betsy wished to associate with other people, including decedent, Kurt Barlow, age 19, who she commenced dating in December. Betsy and Kurt went out together on New Year's Eve, which upset defendant; she visited Betsy on January 1, and they quarreled when defendant was unable to induce Betsy to resume their former relationship.

On January 2 Betsy had several friends, including decedent, over to her home in Lincolnshire to watch a football game on television. At about 7:20 p.m. they saw a flash of light and a flame outside the window; Betsy's mother opened the curtains, but could not raise the window and asked Kurt Barlow to do so. A shot was fired from outside the house which struck decedent in the chest, killing him. Investigating officers were advised by Betsy that she suspected defendant and that on a telephone call to defendant's home 15 minutes after the shooting they were told she was not home. The officers found footprints in the snow emanating from and returning to a grove of trees 167 feet from the window. A cast was made which when later compared to defendant's boots showed the same sole pattern, but no individual identifying characteristics were established.

Later that night police officers went to the home near Long Grove where defendant lived with her parents and, after advising defendant of her *Miranda* rights, inquired where she had been that night. Defendant responded she had helped a friend, Patti Redker, move and had been at an arcade in Mundelein at the time the shooting occurred. The officers also asked defendant's father if he had any guns in the house and were shown a .35-caliber Marlin deer rifle which was kept in his bedroom closet. The officers requested they be permitted to take the rifle for laboratory testing, but the father declined and the officers left without it.

Patti Redker testified in trial she had not seen defendant on the day of the shooting, but that defendant had called her on January 3 requesting she tell police, if they called, that defendant had helped her move. The attendant at the arcade at which defendant said she had been at the time of the shooting testified he did not see her that night. Joni Cordts, who was a friend of defendant, testified she had received a telephone call from defendant on January 1 in which defendant stated that she felt like killing someone and the first victim would be Kurt Barlow. A ballistics expert testified the bullet recovered from decedent's body had been fired from the rifle seized from defendant's home; that weapon, and its scope, was admitted in evidence at trial.

Defendant also testified in trial stating she was outside of Betsy Lou's home that night with her father's deer rifle, but had planned to kill herself, not Kurt Barlow. Defendant testified she was depressed over her breakup with Betsy and went to see her for the last time. When defendant saw there were visitors, she put the rifle near a tree in the woods behind the house and lit a matchbook on the windowsill to draw Betsy's attention. The flame was larger than expected, which frightened defendant, and she ran back into the woods; there she picked up the rifle to shoot herself but, she testified, it went off accidentally as she raised it, killing Kurt Barlow.

Dr. Richard Marohn, a psychiatrist, testified defendant had both a borderline personality disorder and a narcissistic behavior disorder. He stated defendant was severely disturbed with a strong propensity for suicide and was devastated over the loss of Betsy. Evidence was also presented that defendant had in the past received counseling for depression and had twice attempted suicide.

The presentence report and other evidence at the sentencing hearing disclosed defendant had no prior record of arrests, convictions or juvenile delinquency adjudications. There was evidence defendant lacked a good relationship with her parents and that Betsy

became somewhat a surrogate parent. Defendant testified she was aware she had psychological problems for which she wanted help and that she regretted what she had done.

In imposing the 30-year sentence, the trial court noted, *inter alia,* defendant's youth, lack of prior criminal conduct, emotional disabilities and the apparent connection between the latter and the crime; the court also described the offense as a wilful, calculated murder.

■■ Defendant contends first that the deer rifle and ballistic evidence secured from its examination should have been suppressed pursuant to her motion as the fruit of a warrantless search of the home defendant shared with her parents. She asserts that the consent given by her father to the officers' request to see his guns was not voluntary under the circumstances, and the error in admitting that evidence requires reversal for a new trial.

Testimony at the suppression hearing disclosed that two police officers came to defendant's home at 11:20 p.m. on the night of the killing; the parents were watching television and defendant was in her room. The parents testified they were tired and sleepy and neither had prior dealings with police procedures. A telephone call from the police dispatcher informed Mr. Branham the officers were outside, but could not get in, and requested that he go to the door. Branham went outside and saw the officers in a squad car on the driveway which they could not exit because the three family dogs were surrounding the car. He restrained the dogs, and, after being advised by the officers they wished to talk to him about a serious matter, all three went into the house. The officers asked Mr. and Mrs. Branham if their daughter was home; defendant entered the room and, after being advised of her *Miranda* rights, the officers questioned her regarding where she had been that evening.

The parents further testified they asked if an attorney was needed and were told by the officers one was not as it was a routine investigation. Mr. Branham said he felt intimidated by the officers' conduct and evasiveness, and, when the officers asked defendant if she would take a lie detector examination, he became frightened and again asked if they should call an attorney; the police again responded it was a routine investigation. After Officer Travernier finished questioning defendant, he asked Mr. Branham if he had any guns; Branham described three which he owned, one being a .35-caliber rifle with a scope. When Travernier then asked if he could see the guns, Branham arose from his chair and walked into the nearby bedroom and the officer followed him. Branham testified he did not realize Officer Travernier had followed him until he was in the bedroom, but

that he did nothing to prevent it; nor did the officer ask permission or advise Branham he did not have to show the guns. In the bedroom, Branham handed Travernier the rifle in which he was interested. The officer asked if he could take the rifle for laboratory examination, but Branham declined the request. When they returned to the living room, Travernier stated he could get the rifle with a search warrant and then explained the reasons for their inquiry and the fact of the death. Mrs. Branham testified she had asked about the need for an attorney on four occasions while the officers were present, but it was not until her husband and Travernier returned from the bedroom they were advised of the seriousness of the investigation.

The police officers testified to a somewhat different version of matter, one stating the first inquiry by the Branhams relating to whether an attorney should be contacted was by Mrs. Branham while her husband and Officer Travernier were in the bedroom. Both officers said they advised the parents it was a homicide investigation after questioning defendant and before inquiring whether Mr. Branham owned any guns; prior to that point, they had said only it was a very serious and important matter. Officer Travernier stated he asked Mr. Branham if he could see the guns, and, when Branham replied that he could, both men got up and walked into the bedroom. Travernier did not expressly ask permission to accompany Branham or advise Branham he had a right to refuse access to the room. The officers left the premises without taking the rifle or arresting defendant. The rifle was thereafter seized on January 4 under the authority of a search warrant.

In denying suppression of the rifle, the trial court found the officers had inspected it pursuant to Mr. Branham's voluntary consent.

Defendant agrees her father consented to the police examination of the rifle, but argues that it was not voluntary.

Whether there was a voluntary consent to a search is a question to be determined in the first instance by the trial court, and its finding will be affirmed unless clearly unreasonable. Questions of the credibility of witnesses and the weight given their testimony are left largely to the discretion of the trial court. (*People v. DeMorrow* (1974), 59 Ill. 2d 352, 358, 320 N.E.2d 1.) The State has the burden to show by a preponderance of the evidence that the consent was voluntary (*People v. Posey* (1981), 99 Ill. App. 3d 943, 947, 426 N.E.2d 209, *cert. denied* (1982), 456 U.S. 993, 73 L. Ed. 2d 1289, 102 S. Ct. 2276), and whether a consent was voluntary is to be determined from the totality of all the circumstances; while knowledge of the right to refuse consent is one of the circumstances to be considered, it is not the *sine*

*qua non* of a valid consent. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 36 L. Ed. 2d. 854, 863, 93 S. Ct. 2041, 2048; *People v. DeMorrow* (1974), 59 Ill. 2d 352, 361, 320 N.E.2d 1; see *People v. Holliday* (1983), 115 Ill. App. 3d 141, 450 N.E.2d 355; *People v. Glover-El* (1981), 102 Ill. App. 3d 535, 430 N.E.2d 147.

Defendant argues her father's consent to police inspection of the rifle was involuntary because he was not advised of his right to refuse, was not familiar with police procedures and he acquiesced or submitted to an assertion of police authority instead of voluntarily deciding to show them the rifle. Defendant notes it was late in the evening when the police arrived at the Branham residence, that her parents were tired and sleepy, that the police dispatcher had "all but order[ed]" the Branhams to admit the police to the home, and that the officers were evasive as to their purpose and repeatedly advised there was no need to contact an attorney.

It is true that a consent is not voluntary if it is solely the product of acquiescence or submission to an assertion of lawful police authority. (*Bumper v. North Carolina* (1968), 391 U.S. 543, 548-49, 20 L. Ed. 2d 797, 802, 88 S. Ct. 1788, 1792; *People v. Montgomery* (1980), 84 Ill. App. 3d 695, 701, 405 N.E.2d 1275.) It appears to be defendant's argument that the evidence demonstrated overbearing and duplicitous police conduct which overwhelmed the will of defendant's father, who was tired and emotionally distraught because of police questioning of defendant prior to the request to see his guns. We do not agree.

First to be noted is that there was nothing coercive in the police dispatcher's telephoning the Branhams and requesting them to go to their front door. This procedure was prudent, as the officers could not leave their car and go to the Branhams' front door because of the barking dogs which surrounded it. Mrs. Branham testified the dispatcher asked her to "please go to [the] front door" because of the officers' predicament, and her husband subsequently admitted them to the house after they said they wanted to ask him some questions. This circumstance does not support a theory of coercion or submission to a claim of lawful authority by which the police gained entry to the home.

While the officers did not initially advise the Branhams of the exact nature of their investigation, defendant cites no authority requiring such an admonition for a valid consent to search. Moreover, both policemen testified the Branhams were advised of the nature of the crime before they asked if Mr. Branham owned any guns and if they could see them. The trial court was free to accept the police version

instead of the Branhams' conflicting testimony regarding this. (See *People v. DeMorrow* (1974), 59 Ill. 2d 352, 320 N.E.2d 1.) Whether or not the officers told the Branhams before the rifle was inspected that there was no need to contact an attorney, which the police denied, it would not affect this issue, as defendant received the *Miranda* warnings before she was questioned or the rifle inspected. See *United States v. Piet* (7th Cir. 1974), 498 F.2d 178, 181-82.

While defendant also suggests the lateness of the hour when the police arrived and her father's testimony he was unfamiliar with police procedures as evidence his consent was not voluntary, we do not consider that to be the case. Indeed, Mr. Branham was a highly educated, professional person, who evidenced knowledge of his constitutional rights when he refused to let the police take the rifle for testing after he had allowed the officer to inspect it. In light of such circumstances, we cannot say Mr. Branham's will was overcome by the police officers and his consent involuntary, regardless of whether he may have been tired and emotionally distraught by their questioning of his daughter. See *United States v. Stone* (7th Cir. 1972), 471 F.2d 170; *United States v. Black* (N.D. Ill. 1981), 510 F. Supp. 989, *aff'd* (7th Cir. 1982), 675 F.2d 129; *People v. Odom* (1980), 83 Ill. App. 3d 1022, 404 N.E.2d 997, *appeal denied* (1980), 81 Ill. 2d 597; *People v. Johnson* (1975), 28 Ill. App. 3d 799, 329 N.E.2d 464, *appeal denied* (1975), 60 Ill. 2d 599.

A reviewing court will not reverse the trial court's finding on a motion to suppress evidence unless it is manifestly erroneous. (*People v. Stout* (1985), 106 Ill. 2d 77, 88, 477 N.E.2d 498; *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766.) The rifle was initially viewed by the investigating officers pursuant to the voluntary consent of its owner, and we conclude both it and the evidence derived from it were admissible and the trial court correctly denied defendant's motion to suppress.

■ We consider next whether the 30-year term of imprisonment for this offense was excessive and should be reduced. Defendant argues the sentence does not adequately reflect her prospects for early rehabilitation, noting her youth, lack of prior criminal record and the emotional and psychological problems which she asserts induced the murder.

All penalties must be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, sec. 11; Ill. Rev. Stat. 1983, ch. 38, par. 1001—1—2.) A reviewing court will reduce a sentence only where it constitutes a substantial departure from the fundamen-

tal spirit and purpose of the law and is an abuse of discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) The trial court ordinarily is in the best position to make a reasoned judgment as to a sentence which balances the need to protect society and rehabilitate the offender, and its judgment is due great weight and deference. (*People v. LaPointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) A reviewing court will not substitute its judgment solely because it might have balanced the sentencing factors differently if the task of sentencing was given to it. (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541.) Although rehabilitation is a factor which must be considered, it is not the sole factor and does not outweigh other considerations which are persuasive of a severe sentence. *People v. Watson* (1982), 107 Ill. App. 3d 691, 697, 438 N.E.2d 453, *appeal denied* (1982), 92 Ill. 2d 572.

The mitigating factors upon which defendant relies are insufficient of themselves to justify a sentence reduction if the sentence was otherwise supported. (See *People v. Henderson* (1980), 83 Ill. App. 3d 854, 404 N.E.2d 392, *appeal denied* (1980), 81 Ill. 2d 596; *People v. Seaberry* (1978), 63 Ill. App. 3d 718, 380 N.E.2d 511, *appeal denied* (1978), 71 Ill. 2d 620; *People v. Miller* (1974), 21 Ill. App. 3d 762, 316 N.E.2d 269, *appeal denied* (1974), 56 Ill. 2d 590.) Commission of a premeditated murder is a matter which supports a sentence greater than otherwise might have been merited. (*People v. Miller* (1974), 21 Ill. App. 3d 762, 768, 316 N.E.2d 269, *appeal denied* (1974), 56 Ill. 2d 590; see also, *People v. Donald* (1977), 56 Ill. App. 3d 538, 371 N.E.2d 1101.) The cases relied upon by defendant are inapposite, as they did not involve a deliberate, planned murder as in this case. We conclude the trial court did not abuse its sentencing discretion in view of the nature of the offense. See *People v. Slago* (1978), 58 Ill. App. 3d 1009, 374 N.E.2d 1270.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

HOPF and SCHNAKE, JJ., concur.