THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH ROGERS, Defendant-Appellant.

First District (3rd Division)   No. 1—88—3453

Opinion filed December 23, 1992.

GREIMAN, P.J., specially concurring.

Rita A. Fry, Public Defender, of Chicago (Lisa Ottenfeld and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Laurie N. Feldman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

After a jury trial, defendant Joseph Rogers was convicted of attempted first degree murder, aggravated battery, and armed violence. (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4, 12—4, 33A—2.) Defendant was sentenced to 10 years' imprisonment for attempted first degree murder. Defendant appeals the judgment of conviction. We affirm.

The State presented the following sequence of events at trial: On September 2, 1987, Chicago police department detectives Thomas Keough, John Duffy, and Michael McDermott went to the single-story home of Patricia Jackson at 10353 South Crandon, Chicago, Illinois. Keough rang the doorbell and Jackson's 14-year-old nephew, Steven Cannon, who also lived in the house, answered the door at approximately 12:30 p.m. Keough identified himself and asked Cannon if the house was the Jackson residence, to which Cannon said yes. Keough told Cannon that the police were looking for defendant. Cannon then invited Keough and McDermott in, led them to a rear bedroom and pointed out the sleeping defendant.

In the bedroom, the detectives saw defendant lying under a blanket which was pulled up to his eye level and covered his hands. It was at this point the two detectives, now joined by Duffy, first drew their guns, awakened defendant and identified themselves. The police brought defendant into the dining room, handcuffed him, sat him at a table, informed him of his *Miranda* rights, and told him that he was being arrested for the shooting of Antoine Page. Defendant indicated he understood his rights and agreed to talk with the police.

At approximately 12:45 p.m., the police took defendant directly from the Jackson residence to the Area Two police station and placed him in an interview room, handcuffed to a ring on the wall. At 3:15 p.m., Duffy and Assistant State's Attorney Don Jonker went into the interview room, uncuffed defendant, and sat him at a table. Jonker

identified himself to defendant as an assistant State's Attorney and informed defendant of his rights. Defendant indicated that he understood his rights. During the 15- or 20-minute interview, defendant gave only an oral statement. Defendant never stated that he did not wish to talk or that he wanted to make a phone call or speak to an attorney.

The defendant contends that the following occurred: At the Jackson residence, a detective pointed a gun at Cannon's chest and asked where defendant was. After Cannon answered, the officers, without permission, went to the back room to get defendant. Furthermore, Cannon believed he had no choice but to allow the police entry. Defendant was in a back bedroom watching television with the door locked. Defendant heard a knock at the door, opened it, and saw the three detectives. Two of the three detectives came in the room and pointed guns at defendant's head. The third detective handcuffed defendant.

In the dining room, the police told defendant that he was under arrest. Defendant contends that, while in the house, he was not given *Miranda* warnings or told why he was under arrest. However, Cannon testified that the police did, in fact, give defendant his *Miranda* warnings. It was at this point that defendant had a "slight conversation" with Duffy.

The police then, according to defendant, took him to the fourth district police station and then to the Area Two police station, where they placed him in various rooms and handcuffed him to the wall. At 3:15 p.m., Duffy came into the room with Jonker who, only in the midst of questioning defendant, read the *Miranda* warnings to defendant. Defendant asked Jonker if he could make a telephone call to a lawyer. Jonker told defendant that he could make the telephone call only after the interview was done and continued questioning defendant.

Before trial, defendant moved to quash his warrantless arrest and suppress subsequent statements, contending such statements were tainted fruit of an illegal arrest and made absent *Miranda* warnings. The trial court found that the police did not have guns drawn at the Jackson residence when Cannon answered the door; Cannon was sufficiently mature and streetwise to be capable of consenting to the police entry and had, in fact, consented to the police entry, rather than merely acquiescing to police authority; and Cannon led the detectives to defendant and pointed him out to them. Accordingly, the trial court denied the motion to quash arrest.

The trial court further found that Duffy and Jonker both gave defendant *Miranda* warnings prior to interviewing him, and that he

understood these warnings and chose to waive his rights. The court found that defendant did not request an attorney. Therefore, the court denied the motion to suppress statements subsequent to arrest.

Defendant made four additional pretrial motions. The first was a motion to allow evidence of complainant Page's alleged gang affiliation. The court granted the motion to the extent that gang affiliation related to interaction of the complaining witness and defendant. The second motion was to allow evidence of Page's alleged drug sales and usage. This motion was granted as to drug usage, but denied as to sales. Thus, defendant would be permitted to bring out the specific instance of Page allegedly giving defendant cocaine to sell. The third was a motion *in limine* to keep out evidence of extra-indictment crimes. The evidence in question was a police report which contained a statement allegedly made by defendant, just before allegedly shooting Page, that "I have just killed somebody." The motion was denied. Defendant then asked the trial court for a limiting instruction. The trial court indicated it would consider an instruction if and when such evidence came in. The fourth motion was to exclude defendant's prior conviction for voluntary manslaughter. The trial court denied this motion.

At trial, the State presented the following chronology of the events of September 2, 1987, leading up to the shooting of Antoine Page: On the night in question, at about 3 a.m., Page received a phone call from a friend who had arranged a party and invited Page to come to his house, which was two blocks away. A short time later, Page began to walk to the friend's house and heard gunshots. Two minutes later, Page saw defendant running from a housing project into a prairie area across the street. Page recognized defendant as a neighborhood acquaintance.

Page called to defendant, "Joe, come here." Defendant initially continued running but then approached Page. Standing two feet from Page, defendant stated that he had just shot someone and threatened, "You called my name and I'm going to shoot you now." Page was unarmed and no one else was in the area. Page told defendant to quit playing around. Defendant drew closer to Page and then shot him in the face.

Page ran a couple of houses down to the home of a friend, Mark Jones. Page knocked on the door but no one answered. At this point, Page was bent over, bleeding from the mouth and nose. He then felt a blow to the back of his head from a hard object, sensed someone behind him, and heard a click. Page ran into a gangway, and looking back, saw defendant running away.

Page ran home and told his mother that he had been shot. Later,

Page told the police that defendant had shot him. Page was eventually taken to a hospital where a .22 caliber bullet was removed from his left nasal cavity.

Defendant presented the following sequence of events leading up to the shooting of Page: Defendant joined the "El Rukn" street gang in 1980 or 1981. He quit the gang in 1984. From that point on defendant was harassed by the "Vice Lords" street gang, the neighborhood El Rukn affiliate, specifically Page, Jones, Othen McCahey, and two other individuals known as "Chico" and "Shabaz."

On February 20, 1985, in an unrelated matter, defendant was convicted of voluntary manslaughter. After defendant was released from prison in 1986, Page came to defendant's house and announced that he had "protected" defendant's family from the El Rukns while defendant was incarcerated. Page told defendant that he expected to be paid for this protection. On September 1, 1987, Page told defendant that he wanted defendant to sell some packets of cocaine for him as a final payment on defendant's obligation to Page for protecting defendant's family.

Defendant testified that at approximately 2 a.m. on September 2, 1987, he received a telephone call from a woman named Fifi, who told him that she had been arguing with her boyfriend and wanted defendant to come and pick her up. Defendant went to Fifi's residence, rang the doorbell several times, to which no one answered, and then decided to return home.

On his way home, defendant saw Page, Jones, Chico, and another person sitting in an automobile. Page called to defendant, but defendant continued walking. Defendant looked over his shoulder and saw the four individuals get out of the car. Defendant then ran to the Trumbull Park housing project and hid. Later, Page and Jones found him. Jones had a rifle and Page had a handgun pointed at the unarmed defendant's chest. Page and defendant argued over the money defendant was to have collected for selling Page's cocaine. Page ordered defendant into a prairie five feet away. Defendant refused to move and kicked Page. The two fell to the ground and struggled over Page's gun. The gun went off and defendant ran away.

At trial, the jury found defendant guilty of attempted first degree murder, aggravated battery, and armed violence. The trial court entered a verdict of guilty for attempted first degree murder.

After the trial was over, but before sentencing, defendant was being transported to the courthouse from jail with Gary Fisher, a member of a street gang called "The Disciples," a rival of the Vice Lords. Fisher told defendant that he knew Page, knew Page was a Vice Lord, and was willing to testify to that fact. Subsequently, Fisher

executed an affidavit to that effect. At trial, Page denied that he was or ever had been a member of a gang.

We first turn to defendant's contention that the trial court erred in denying his motion to quash his arrest and suppress the statements resulting from such arrest, thus violating his rights under the fourth amendment of the United States Constitution and article I, sections 2 and 6, of the Illinois Constitution. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §§ 2, 6.) In order to decide whether defendant's arrest and the statements derived from it were proper, we must review the trial court's finding that Cannon was capable of consenting to the police's entering the Jackson residence. Defendant contends that 14-year-old Cannon was not capable of consenting to the police search but instead was bowing to police pressure or authority.

We start from the principle that a trial court's determination that a search was consensual is a factual matter entitled to deference upon review by this court. Where the evidence on the issue is in conflict, a reviewing court will accept the finding of the trial court unless it is clearly unreasonable. (*People v. DeMorrow* (1974), 59 Ill. 2d 352, 320 N.E.2d 1.) The burden the State had to carry in this instance was to prove by a preponderance of the evidence that in light of the totality of the circumstances, Cannon voluntarily allowed the detectives to enter the Jackson residence. (*People v. Branham* (1985), 137 Ill. App. 3d 896, 484 N.E.2d 1226.) There is no *per se* rule that precludes a minor child from giving consent to a search by the police; age alone is not an automatic barrier to capacity to consent. Age is but one factor considered by a court; others are: the time of the intrusion; whether there was some initial refusal or resistance to the search; and whether the minor had knowledge of a right to refuse. *People v. Swansey* (1978), 62 Ill. App. 3d 1015, 379 N.E.2d 1279.

■ Here, the trial court rejected the idea that Cannon merely submitted to police authority or acquiesced out of fear of the police. The search at issue in this case occurred at 12:30 p.m., not an unreasonable hour of the day. There is nothing in the record to indicate that Cannon in any way resisted or refused the police's request. Furthermore, the trial court specifically found Cannon sufficiently mature and streetwise to consent. Thus, we conclude that there was no manifest error by the trial court in finding that Cannon had the capacity to consent. Accordingly, the trial court did not err in denying defendant's motion to quash his arrest.

■ We now examine the issue of whether the trial court erred in allowing the admission of defendant's post-arrest statements into evidence. Assuming, *arguendo*, that defendant's post-arrest statements were tainted, it is nevertheless irrelevant, as such statements were

introduced by the State not in its case in chief, but rather in rebuttal for the purpose of impeachment. Evidence obtained in violation of *Miranda* or the fourth amendment, so long as such evidence is not coerced, can be properly admitted to rebut previous inconsistent testimony of a defendant. The constitutional protections guaranteed by the fourth amendment and *Miranda* cannot be "perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (*Harris v. New York* (1971), 401 U.S. 222, 226, 28 L. Ed. 2d 1, 5, 91 S. Ct. 643, 646.) Furthermore, the trial court instructed the jury that such statements could only be considered for the purpose of deciding the weight to be given defendant's testimony. Consequently, the State's introduction of defendant's statements in rebuttal for impeachment purposes was not improper.

Defendant next urges that the trial court erred in allowing testimony of extra-indictment offenses into evidence. He argues that such testimony unfairly prejudiced him and that this error was compounded by the trial court's failure to give the jury a limiting instruction. Statements made by a defendant which illustrate, explain, or interpret by way of collateral criminal acts, which are interwoven with the criminal transaction for which the defendant is being tried, are admissible as a part of the *res gestae* of the underlying criminal transaction. Such statements are admissible even if they tend to suggest prejudicial outside crimes of the defendant. The prejudicial effect of such evidence outweighing its probative value is a decision within the discretion of the trial court. (*People v. Calcaterra* (1966), 33 Ill. 2d 541, 213 N.E.2d 270, *cert. denied* (1966), 385 U.S. 7, 17 L. Ed. 2d 8, 87 S. Ct. 65; *People v. Glover* (1988), 173 Ill. App. 3d 678, 527 N.E.2d 968.) We believe the *res gestae* doctrine is directly applicable to defendant's statements to Page regarding another shooting.

The fact that defendant made statements about another shooting to Page, regardless of their basis in fact, is highly probative of defendant's state of mind, which the defense placed in issue in this case under the theory of accident or self-defense. Moreover, these statements about another shooting and defendant's need to shoot Page demonstrate an intent of defendant to shoot Page and defendant's initiation of the conflict. Therefore, we find that the trial court did not commit error in admitting these statements and denying the motion *in limine*.

Additionally, we note that the evidence at issue was not "other crimes" evidence as defendant suggests, and, therefore, we find a limiting jury instruction need not have been tendered to the jury and, thus, no error was committed by the trial court in this regard.

We next turn to defendant's argument that the trial court abused its discretion in allowing defendant's testimony to be impeached by his prior voluntary manslaughter conviction. Defendant contends the conviction's probative value was outweighed by its unfair prejudice to him. Additionally, defendant contends that the trial court exacerbated this perceived error in not allowing in the circumstances of the conviction. Section 6 of "An Act to revise the law in relation to criminal jurisprudence" (Ill. Rev. Stat. 1987, ch. 38, par. 155—1) provides, in pertinent part:

"No person shall be disqualified as a witness in any criminal case *** by reason of his or her having been convicted of any crime; but such *** conviction may be shown for the purpose of affecting the credibility of the witness."

The appellate court in *People v. Hall* (1983), 117 Ill. App. 3d 788, 453 N.E.2d 1327, *cert. denied* (1984), 467 U.S. 1228, 81 L. Ed. 2d 878, 104 S. Ct. 2683, outlined the abuse of discretion standard set forth by the Illinois Supreme Court in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, as follows:

"In *People v. Montgomery* [citation], the supreme court held that a defendant's prior convictions may be admitted for impeachment purposes at the trial court's discretion if (1) the prior offense was punishable by imprisonment in excess of one year or involved dishonesty, and (2) if either the conviction or release from confinement occurred within the preceding 10 years. The *Montgomery* court further stated that once the first two prerequisites are met, the court must then balance the prejudicial effect of the prior conviction on the jury against its probative value. As a guide to the balancing process, the *Montgomery* court suggested that the following factors be considered: (1) nature of the crime; (2) nearness or remoteness of the prior crime; (3) the subsequent career of the person; and (4) whether the crime was similar to the one charged." *Hall*, 117 Ill. App. 3d at 798.

In the case at hand, the initial prerequisites of *Montgomery* have been met, *i.e.*, the prior voluntary manslaughter conviction was punishable by imprisonment in excess of one year (Ill. Rev. Stat. 1987, ch. 38, par. 9—2) and both the conviction and the release occurred within the preceding 10 years. Consequently, testimony regarding the prior voluntary manslaughter conviction was admissible unless its probative value was substantially outweighed by the danger of unfair prejudice. Thus, we must now apply *Montgomery's* four remaining factors.

The first factor is the nature of the crime. It has been held that a prior conviction for manslaughter introduced against a defendant is not an abuse of discretion and bears directly on the credibility of his

evidence supporting his justification for killing. (*People v. Evans* (1981), 92 Ill. App. 3d 874, 416 N.E.2d 377.) We believe that defendant's previous conviction is very probative of his credibility given the nature of the offense in this case and the defenses of accident and self-defense put forward by defendant.

The second factor is nearness or remoteness of the crime. "It is well established that recency between release and arrest reflects negatively on defendant's likelihood of being rehabilitated, and, in turn, impacts on his credibility." (*Hall*, 117 Ill. App. 3d at 799.) Here, it was only approximately one year from defendant's release to the time of the shooting of Page. In our opinion, this short a period of time clearly impacts on defendant's credibility.

The third factor is that of the subsequent career of a defendant. In the case at hand, this factor is not relevant, one way or another, due to the relatively short period of time between defendant's release from prison until the time of the shooting.

The fourth factor is whether the crime a defendant was convicted of was similar to the one charged. While the similarity between the two crimes is a factor, we believe the trial court properly weighed it and found the prejudice insufficient to exclude the evidence. Moreover, the trial court's tendering of a jury instruction compensated for any prejudice which might have occurred in its absence.

We perceive no error in the trial court's denial of defendant's motion to exclude his prior conviction for voluntary manslaughter. We further find that defendant waived his contention that the trial court erred in not allowing into evidence the circumstances of his conviction by failing to raise it in his post-trial motion "and, therefore, it cannot be urged as [grounds] for reversal on review." *People v. Young* (1989), 128 Ill. 2d 1, 38, 538 N.E.2d 453, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.

The next argument advanced by defendant on appeal is that the trial court erred in declining to grant him a new trial based on allegedly newly discovered evidence that Page perjured himself by denying his gang membership. Defendant urges that newly discovered evidence, Fisher's affidavit, is material to the issue of whether Page was the aggressor. In the frequently cited opinion of *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1, the Illinois Supreme Court succinctly summarized the criteria to be considered in reviewing a trial court's denial of a motion for a new trial. The court there stated:

> "A motion for a new trial on the ground of newly discovered evidence is addressed to the discretion of the trial judge and denial thereof will not be disturbed upon review in the absence of a showing of an abuse of discretion. [Citation.] To warrant a new

trial, the new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. [Citations.]" *Baker*, 16 Ill. 2d at 373-74.

■ Applying this standard, there was no abuse of discretion by the trial court in denying defendant's motion for a new trial. Fisher's affidavit is insufficient to constitute the difference between conviction and acquittal. Even if Fisher were to testify, he could add nothing new. Defendant himself testified that Page was a gang member. New evidence which merely corroborates testimony that was given on a noncritical fact is not a basis for granting a new trial. *People v. Leonhardt* (1988), 173 Ill. App. 3d 314, 527 N.E.2d 562.

Defendant next claims that he was denied a fair trial when evidence allegedly relevant to his theory of defense was excluded by the trial court. Defendant assigns error to the trial court having precluded him from presenting two lines of evidence: (1) evidence of threats made by Page and allegedly other fellow gang members which would establish Page's aggressive and violent character and, consequently, defendant's fear of him; and (2) evidence that Jones, while in the courthouse, threatened Frank Rogers, defendant's brother, that should he testify at defendant's trial, Jones would shoot him. We begin our discussion of this issue by noting that it is established law that each party is entitled to present evidence relevant to his theory of the case. (*People v. Molsby* (1978), 66 Ill. App. 3d 647, 383 N.E.2d 1336.) However, it is also settled law that:

"A trial court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature. [Citations.] The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion." *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696.

■ In reviewing the present case in light of the above-mentioned principles, we find no abuse of discretion by the trial court with regard to his first line of evidence. The trial court properly excluded only irrelevant evidence. In fact, the record reveals that defendant was permitted to call witnesses at trial to evidence Page's alleged gang membership and aggression towards defendant. In addition, defense counsel thoroughly cross-examined and re-cross-examined Page along this line. Additionally, we find defendant's suggestion that he should have been permitted to present evidence of gang

violence not involving Page, as relevant to defendant's state of mind, untenable. Such evidence would have been too remote to be relevant.

We find defendant's argument with regard to Jones' alleged threats against defendant's brother also unconvincing. Defendant's argument is that although the threat did not come from Page, the threat can be attributed to him, thus showing his "consciousness of guilt" if he did not disapprove of or oppose the act. As the trial court stated, even if Page stood next to Jones while Jones made the alleged threat, this demonstrates nothing more about Page than mere presence. Furthermore, given the differing versions of what actually occurred, it would take a side trial just to determine the satellite issues raised by this alleged occurrence. Accordingly, the trial court correctly found this evidence to be too attenuated to be admissible and properly excluded it.

We next consider defendant's assertion that the trial court abused its discretion by refusing three of defendant's tendered jury instructions in the following three areas: (1) accidental shooting; (2) intoxication of the victim; and (3) limiting consideration of defendant's statements to Page regarding extra-indictment offenses as "other crimes" evidence. We note that we have already disposed of the argument regarding "other crimes" evidence in the context of our discussion of extra-indictment offenses above. Additionally, as defendant failed to include his claim of error regarding the alleged intoxication of Page at the scene of the crime in his post-trial motion, it is deemed waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Thus, we need only examine defendant's contention with regard to the trial court's refusal of the accidental shooting instruction.

■ An instruction on accident is inappropriate where a jury is instructed on the elements of the crime and that the State has the responsibility of proving defendant's *mens rea*. (*People v. Spaulding* (1979), 68 Ill. App. 3d 663, 679, 368 N.E.2d 469.) Here, the trial court instructed the jury on the mental states of intent and knowledge necessary to find defendant guilty of first-degree murder, attempt, battery, aggravated battery, and armed violence as well as the State's burden of proof. Thus, by definition, the jury could not have found defendant guilty had it determined that the shooting of Page was the result of an accident, as he would necessarily not possess the requisite *mens rea*. Under these facts, an instruction on accident would have been unnecessary, and, therefore, the trial court correctly refused the instruction.

■ Defendant next submits that the State failed to prove him

guilty beyond a reasonable doubt. After a careful review of the record, we believe that there is ample evidence from which the jury could have concluded that Joseph Rogers shot Antoine Page without serious provocation. The jury choose to believe the State's version of the shooting. While defendant's story is quite different, it is the function of the jury to determine the credibility of witnesses and resolve conflicts. (*People v. Jordan* (1960), 18 Ill. 2d 489, 165 N.E.2d 296.) A court of review will disturb a finding of guilt only where the evidence is unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of a defendant's guilt. (*People v. Crews* (1967), 38 Ill. 2d 331, 231 N.E.2d 451.) In the instant case, the evidence leaves no reasonable doubt of defendant's guilt.

■ Finally, defendant argues that, in the aggregate, the errors assigned by him require reversal. However, as we have shown above, defendant's claims individually lack substance; therefore, it follows that they cannot collectively have force.

In light of the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RIZZI, J., concurs.

PRESIDING JUSTICE GREIMAN, specially concurring:
Like an entombed vampire, every now and again "Count *Res Gestae*" moves the cover of his coffin and begins to circulate in the world of litigators and judges, promising them that they no longer must provide rational analysis or appropriate explanations for exceptions to the hearsay rule. Instead, they need only mutter "*res gestae*" to cover a multitude of sins.

Traditionally, the phrase "*res gestae*" was used to describe words which accompanied the key litigated fact, such as the murder, collision or other occurrence which was the specific subject of the action. However, use of the term grew to allow words accompanying any relevant act or condition admitted into evidence. 2 J. Strong, McCormick on Evidence § 268, at 207 (4th ed. 1992).

During the last 70 years, every major commentator has criticized the notion of *res gestae* because of its imprecision. *E.g.*, 2 J. Strong, McCormick on Evidence § 268, at 206-08 (4th ed. 1992); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.2, at 549 (4th ed. 1984); 6 J. Wigmore, Evidence § 1745, at 191-93 (Chadbourn rev. ed. 1976); Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae*, 31 Yale L.J. 229 (1922).

Our supreme court rejected *res gestae* more than 30 years ago in *People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804. (See also *Rockford Clutch Division, Borg-Warner Corp. v. Industrial Comm'n* (1967), 37 Ill. 2d 62, 224 N.E.2d 830, and this court's most recent comment in *Kellman v. Twin Orchard Country Club* (1990), 202 Ill. App. 3d 968, 560 N.E.2d 888.) The *Poland* court believed that reliance upon this concept failed to contribute to an understanding of the problems of hearsay and further inhibited any reasonable analysis. *Poland*, 22 Ill. 2d at 178.

The court's more recent comment on *res gestae* appeared in *People v. Tye* (1990), 141 Ill. 2d 1, 18, 565 N.E.2d 931, where the court concluded that: "At trial, defense counsel did not specifically invoke the excited utterance exception to the hearsay rule, relying instead on the more general, and *disapproved*, *res gestae* concept." (Emphasis added.)

Despite decades of uniform criticism of the use of *res gestae*, the majority has elected to let the *res gestae* vampire out of its coffin.

I would hope that this concurring opinion can be the equivalent of a stake in the heart of *res gestae* and that the coffin lid may be securely fastened.

Otherwise, I concur in the result.